**Peter J. LEDIG, Appellant,**

v.

**DUKE ENERGY CORPORATION and Duke Energy Trading and Marketing, L.L.C., Appellees.**

No. 01–04–00922–CV.

Court of Appeals of Texas, Houston (1st Dist.).

March 23, 2006.

---

Gregg M. Rosenberg, Gregg M. Rosenberg & Associates Houston, for Appellant.

Robert L. Ivey, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Houston, for Appellees.

Panel consists of Justices NUCHIA, JENNINGS, and HIGLEY.

## OPINION

TERRY JENNINGS, Justice.

Appellant, Peter J. Ledig, challenges the trial court's rendition of summary judgment in favor of appellees, Duke Energy Corporation ("Duke Energy") and Duke Energy Trading and Marketing, L.L.C. ("DETM"), in his suit for "unjust enrichment, rescission of contract, breach of contract, misrepresentation, and defamation," brought after DETM terminated his employment. In four issues, Ledig contends that the trial court erred in granting partial summary judgment in favor of appellees because genuine issues of material fact exist regarding whether his election, made while employed by Duke Energy North America ("DENA"), to exchange 50% of any bonus he might receive in 2001 for Duke Energy stock options applied to the bonus he received from DETM following his transfer to DETM in 2001; whether "the illusory nature of the [election] agreement precludes summary judgment on [his] equitable claims"; whether DETM was required to pay Ledig a bonus for the full year of 2001, rather than a pro-rated bonus; and whether "libelous statements published by [a]ppellees defamed [a]ppellant given that a reasonable reader could reasonably believe them to be true." We affirm.

### Factual and Procedural Background

On December 29, 2000, while employed by DENA, a non-party to this lawsuit, Ledig elected to exchange 50% of any bonus he might receive in 2001 for Duke Energy stock options. Ledig made this election by signing the "Short Term Incentive Exchange Program Election Form 2001." The front page of the election form instructed Ledig to "[c]omplete and submit this form no later than Dec. 29, 2000, to make your election under this Program for 2001" and further stated that "[e]lections that you make to forgo bonus in exchange for stock options will remain in effect for subsequent years, unless you are no longer eligible for the Program or make a change during a subsequent election period." The election form provided the following cautionary instruction: "Because your choices under this Program have significant financial implications, we encourage you to review your Program brochure and share the information with your financial or tax advisor." By signing this form, Ledig acknowledged the following:

I hereby authorize Duke Energy to reduce my bonus ... as I elected on this form. I understand ... that if I forgo bonus under the Short–Term Incentive Exchange Program, I will be granted a stock option under the Duke Energy Corporation 1998 Long–Term Incentive Plan in exchange, with the number of shares and exercise price of my stock option to be determined on the grant date. I further understand that if my Duke Energy employment terminates or I become ineligible for the Program before the stock option is granted, my election to forgo bonus will automatically be cancelled.... I confirm that I have been given copies of the Short–Term Incentive Exchange Program brochure.... I also understand that my election[ ] to ... forgo bonus to be earned in 2001 in exchange for a stock option under the Program *[is] irrevocable after Dec. 29, 2000, will take effect*

*Jan. 1, 2001, and will continue for subsequent years as long as I remain eligible unless I file a change in a subsequent election period.*

(Emphasis added). The Duke Energy Short Term Incentive Exchange Program (the "Program") brochure, which described the restrictions of the Program, and which Ledig conceded receiving prior to signing the election form, provided

YOUR ELECTION MUST BE MADE IN ADVANCE AND IS IRREVOCABLE

Participating in this program gives you certain tax advantages, but also imposes some restrictions. For example, the bonus that you exchange for stock options will not be subject to current income taxes. To preserve this tax advantage, however, you must decide about participating in the program before the beginning of the period during which you bonus is earned.

Your agreement to make this exchange is irrevocable. After the annual election deadline, you cannot cancel the agreement and receive the cash bonus you elected to forgo. However, if your Duke Energy employment terminates before the option is granted, your election to forgo bonus is automatically cancelled.

The brochure further provided

To participate in the program, you must have earned a bonus under the short term incentive plans applicable to your business unit. Below is a list of plans that determine how you become eligible for bonuses and the amount you may receive. These plans are incorporated by reference into this program.

Included in this list of nine plans were (1) the Duke Energy International/Duke Energy North America Annual Incentive Program (the "DENA Plan") and (2) the Duke Energy Services Trading Pool Plan (the "DETM Plan").

Ledig testified that, in April 2001, he left his position with DENA and began employment with DETM as the Vice President of Eastern Gas Trading. His election to exchange 50% of his 2001 bonus for Duke Energy stock options under the Program was based on the fact that the DENA Plan was a corporate plan with limited bonus potential and that his maximum bonus potential under the DENA Plan was approximately 53% of his salary. After beginning employment with DETM, Ledig determined that his election under the Program "no longer made economic sense" because his bonus potential under the DETM Plan was over 700% of his salary. Thus, after beginning employment with DETM, he told Jackie Salinas, Director of Human Resources, that he wanted to change his election from 50% to 0%. Salinas told Ledig the he could not change his election due to an Internal Revenue Service regulation. In early 2002, Ledig was awarded $1,500,000 for his 2001 bonus under the DETM Plan and, based on Ledig's election under the Program, DETM converted 50% of his bonus to Duke Energy stock options.

Ledig further testified that, "in connection" with his move to DETM, he spoke with his supervisor, Todd Reid, concerning whether his 2001 DETM bonus would be pro-rated. According to Ledig, Reid assured him that he would receive a bonus for the full year of 2001, despite the fact that Ledig commenced employment with DETM, at the earliest, in April 2001. Ledig learned that Reid had received a bonus for the full year of 2000 even though Reid started at DETM in May 2000, and Ledig knew from "personal observation" that another DETM employee, Tim Kramer, received similar treatment with respect to his bonus for the year 2000. Ledig asserts

that his 2001 bonus was pro-rated, in violation of Reid's promise and in contrast to the past treatment of Reid and Kramer.

In May 2002, in response to an inquiry from the Securities and Exchange Commission ("SEC"), appellees conducted investigations into the company's energy trading practices, and, on August 1, 2002, following the conclusion of those investigations, Ledig was removed from his management position with DETM. Ledig asserts that on that day, DETM represented that he was being retained and would be reassigned to a new job. However, Ledig's employment was terminated after he received his salary from DETM through November 2002. On or about August 1, 2002, appellees allegedly published statements referencing the discharge of employees in connection with their investigation into energy trading practices.

Ledig filed suit, asserting multiple claims arising out of the above alleged incidents. Pertinent to this appeal, we consider the claims made in counts one, four, and five of Ledig's second amended petition. In count one, labeled "rescission of contract, misrepresentation, and unjust enrichment," Ledig, in regard to his election to exchange 50% of his 2001 bonus for Duke Energy stock options, asserts that he made this election without knowledge that he would be transferred to DETM six months later, "materially changing the amount of the bonus subject to the election." Ledig also asserts that when he moved to DETM, he was told that he would not be able to change his election.

Ledig contends that "as a result of the vagueness of the agreement and the mistake as to the amount subject to the election," he is entitled to rescission of the contract. In count four, labeled "breach of contract, unjust enrichment, and misrepresentation," Ledig, in regard to his contention that he is entitled to receive a bonus for the full year of 2001 rather than a pro-rated bonus, asserts that appellees had previously compensated other employees who had been employed for only part of a year as if they had been employed for the full year. Although Ledig does not clearly assert in his petition why he is entitled to a bonus based on a full year, he does, in his summary judgment response, allege that he had an oral agreement with his supervisor to be paid a bonus based on the full year. In count five, labeled "defamation," Ledig alleges that he was falsely accused of (1) directing traders to trade for volume and not for economic benefit, and (2) of not cooperating in the investigation of the trading practices.[1] Ledig asserts that the "circumstances surrounding [his] disaffiliation with Duke are commonly known in the market place and to his peers."

DETM filed a motion for partial summary judgment, attacking the claims asserted by Ledig in counts one, four, and five of his petition.[2] The motion was labeled as a "traditional" and no-evidence motion. *See* TEX.R. CIV. P. 166a(c), 166a(i). Without specifying the grounds upon which it relied, the trial court granted appellees' summary judgment motion as to these claims.[3]

---

1. On appeal, Ledig asserts that he was defamed in two publications, which are included in the record and which we address below.

2. The record indicates that the parties settled other claims asserted by Ledig and that the trial court dismissed Ledig's claim for attorneys' fees in a final judgment entered after a bench trial. The appeal before this Court

concerns Ledig's claims that were disposed by the trial court's order granting appellees' partial summary judgment motion, and this Court is addressing only the propriety of the summary judgment as to those claims.

3. The trial court denied DETM's summary judgment motion in regard to Ledig's claim

## Standard of Review

To prevail on a Rule 166a(c) summary judgment motion, a movant has the burden of proving that it is entitled to judgment as a matter of law and that there is no genuine issue of material fact. TEX.R. CIV. P. 166a(c); *Black v. Victoria Lloyds Ins. Co.*, 797 S.W.2d 20, 23 (Tex.1990); *Farah v. Mafrige & Kormanik, P.C.*, 927 S.W.2d 663, 670 (Tex.App.-Houston [1st Dist.] 1996, no writ). We may affirm a summary judgment only when the record shows that a movant has disproved at least one element of each of the plaintiff's claims or has established all of the elements of an affirmative defense as to each claim. *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex.1997); *Farah*, 927 S.W.2d at 670. In deciding whether there is a disputed material fact issue precluding summary judgment, proof favorable to the non-movant is taken as true, and the court must indulge every reasonable inference and resolve any doubts in favor of the non-movant. *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex.1995); *Lawson v. B Four Corp.*, 888 S.W.2d 31, 33–34 (Tex.App.-Houston [1st Dist.] 1994, writ denied).

When a summary judgment does not specify the grounds on which the trial court granted it, the reviewing court will affirm the judgment if any theory included in the motion is meritorious. *Harwell v. State Farm Mut. Auto. Ins. Co.*, 896 S.W.2d 170, 173 (Tex.1995); *Summers v. Fort Crockett Hotel, Ltd.*, 902 S.W.2d 20, 25 (Tex.App.-Houston [1st Dist.] 1995, writ denied).

## Election to Exchange Bonus for Stock Options

In his first issue, Ledig argues that the trial court erred in granting appellees' summary judgment on his claim for rescission of his election agreement to exchange 50% of his 2001 bonus for stock options because the agreement, signed when he was an employee of DENA and was covered under the DENA Plan, did not bind him to an election to exchange 50% of his 2001 bonus he received under the DETM Plan for stock options. Ledig asserts that the DETM Plan refers only to DETM, not to DENA, and that the election form he signed "refers only to DENA" and "makes no references to DETM." Ledig argues that a material issue of fact exists "as to the uniqueness of the two plans," and that, because the plans are separate, the irrevocability language contained in the election form and the Program brochure is a non-issue. Also, within his first issue, Ledig argues that the trial court erred in granting appellees' summary judgment on his claim for misrepresentation because Ledig also asserts that he was misled by Salinas regarding his ability to change his election after transferring to DETM and that he "presented more than a scintilla of evidence on the challenged elements."

Contrary to Ledig's arguments, there are no material fact issues surrounding his election to exchange 50% of his bonus for stock options that "preclude summary judgment" on his claims for rescission and misrepresentation. Ledig's arguments under his first issue are centered on the proposition that the DENA and the DETM Plans are "separate." However, regardless of whether these plans are separate or unique, under the plain language of the election form and the Program brochure, Ledig's election applied to both the DENA and the DETM Plans.[4] These doc-

"for monies due him under the 2001 Trading Pool Plan for April, 2001."

4. Ledig contends that there is a genuine issue of material fact as to the uniqueness of the two plans and cites appellees' admission in

uments establish that any election made under the Program applied to bonuses earned under any one of nine plans, including the DETM Plan and the DENA Plan. There is no evidence supporting Ledig's assertion that his election under the Program was invalidated upon his transfer to DETM. It is clear that in order to participate in the Program, Ledig was required to make his election in advance and that his election was irrevocable after December 29, 2000. While the Program brochure provides that an employee's election is automatically cancelled if "Duke Energy employment terminates before the option is granted," it does not state that an employee's election is revocable or that it may be cancelled upon the employee's transfer to another Duke Energy business unit subject to the Program. It is of no significance that the election form does not refer to any particular Duke Energy business unit or associated plan because the brochure expressly states that the election applies to bonuses earned under any one of nine plans, including both the DENA and DETM plans. Thus, the summary judgment evidence establishes that Ledig's election applied to any bonus earned at DETM in 2001 and that Salinas did not make any misrepresentation to Ledig when she informed him that he could not change his election under the Program.

■ In regard to Ledig's claim for rescission of contract, "as a general rule, a mistake that justifies rescission must be a mutual, not a unilateral, mistake." *Cigna Ins. Co. of Tex. v. Rubalcada*, 960 S.W.2d 408, 412 (Tex.App.-Houston [1st Dist.] 1998, no pet.). However, equity may permit rescission based on a unilateral mistake when "(1) the mistake is of so great a

consequence that to enforce the contract would be unconscionable; (2) the mistake relates to a material feature of the contract; (3) the mistake occurred despite ordinary care; and (4) the parties can be placed in status quo, *i.e.*, the rescission must not prejudice the other party except for the loss of the bargain." *Id.; James T. Taylor & Son, Inc. v. Arlington Indep. Sch. Dist.*, 160 Tex. 617, 620, 335 S.W.2d 371, 373 (Tex.1960).

■ Here, there is no allegation of mutual mistake. To the extent that there is any allegation of a unilateral mistake, it is only that Ledig did not recognize that his election under the Program was irrevocable for the year 2001 and that his election would apply to a number of different plans, including the DETM plan, in the event that he was transferred to DETM in the year 2001. But this information was disclosed in the Program documents that Ledig conceded receiving before making his election. Thus, Ledig cannot show that enforcement of the terms of the Program would be unconscionable or that he made a "mistake" despite the exercise of ordinary care. Also, although Ledig testified that he would not have made this election had he known that he would be transferred to DETM during the year 2001, this is a "mistake" concerning a future event. A unilateral mistake based on a future event, as opposed to an existing fact, is not the type of mistake that would typically permit a party to void a contract. *See City of Austin v. Cotten*, 509 S.W.2d 554, 557 (Tex.1974); *Green v. Morris*, 43 S.W.3d 604, 607 (Tex.App.-Waco 2001, no pet.) (citing the Restatement and stating that "[m]any authorities, in dealing with mistake, draw a distinction between mis-

their discovery responses that the plans are "wholly different and unrelated." However, appellees do not dispute that the plans are separate or unique. Rather, the issue is

whether the plans are both subject to the Program and whether Ledig's election under the Program applies to bonuses earned under both plans for the year 2001.

takes concerning 'past or present facts' and those concerning factual occurrences in the future").[5] We hold that Ledig's claims for rescission of contract and misrepresentation fail as a matter of law.

In regard to Ledig's claim for unjust enrichment, we note that, generally, "when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory," such as unjust enrichment. *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex.2000). "That is because parties should be bound by their express agreements. When a valid agreement already addresses the matter, recovery under an equitable theory is generally inconsistent with the express agreement." *Id.* Here, Ledig is bound by his express election to exchange 50% of his bonus for stock options, and we hold that his unjust enrichment claim fails as a matter of law. *See id.* at 683–85.

Accordingly, we hold that the trial court did not err in granting appellees summary judgment on Ledig's claims for rescission of contract, misrepresentation, and unjust enrichment arising out of his assertion that his election did not apply to his 2001 DETM bonus.

We overrule Ledig's first issue.

### Illusory Nature of Agreement

In his second issue, Ledig argues that the trial court erred in granting appellees summary judgment "regarding the election of stock options because the agreement supporting the election is itself illusory." He asserts that the agreement provided appellees "with an opportunity to avoid their promises and obligations regarding stock options."[6] Ledig concludes that because the agreement was illusory, the trial court erred in granting summary judgment on his claims against appellees for quantum meruit and unjust enrichment.

The Program brochure provides, in pertinent part:

Duke Energy Corporation reserves the right to change the program in any respect, including terminating the program or discontinuing an employee's eligibility, at any time. Such a change may result in no grant of a stock option that has not been granted prior to the change, and the associated bonus exchange election being cancelled.

Ledig's argument is misplaced. Here, appellees simply provided Ledig with an opportunity to elect to exchange a portion of any bonus he might earn during the year 2001 for Duke Energy stock options, and he, with knowledge that his election would be irrevocable in order to preserve certain tax advantages, elected to exchange 50% of his 2001 bonus for such options. Moreover, the Program brochure plainly stated that participation in the Program was not "an offer or guarantee of

5. There is no allegation, or evidence, that appellees knew that, prior to Ledig making his election, Ledig would be transferred to DETM in the spring of 2001 or that Ledig's 2001 DETM bonus would be so significant and would exceed any bonus that he could have earned at DENA.

6. In his original petition, Ledig also alleged that he was not informed of, or was misled about, the fact that, under the Program, any options would expire three months after termination of his employment. In his second amended petition, Ledig drops this specific complaint, and we do not address it here. However, we note that the brochure specifically states: "If you leave Duke Energy before the tenth anniversary of your options' grant date(s) for any reason other than retirement, death or disability, your opportunity to exercise your option(s) will expire three months after termination of your employment...."

employment" and did not "create an employment contract." Thus, it appears that the parties simply agreed to change how Ledig was to be compensated in regard to any bonus he earned in 2001. *See Hathaway v. Gen. Mills, Inc.,* 711 S.W.2d 227, 229 (Tex.1986) (holding that when employer notifies employee of change to at-will employment contract and employee "continues working with knowledge of the changes, he has accepted the changes as a matter of law").[7]

Although appellees could have terminated the Program or cancelled Ledig's eligibility, appellees could have also terminated Ledig's employment or he could have quit. In fact, pursuant to the terms of the Program, if appellees had terminated Ledig's employment or if Ledig had quit before the options were granted, Ledig's election to forgo his bonus in exchange for stock options would have been automatically cancelled and Ledig would have received any bonus to which he was entitled. Yet, Ledig continued to work for appellees, even after Ledig was told that he could not change his election and that he would be compensated, in part, with stock options, in the event he earned a bonus.

In support of his argument that he should be able to proceed with his equitable claims of unjust enrichment and quantum meruit because the stock option agreement was illusory, Ledig relies on *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223 (Tex.2003), and *In re Halliburton Co.,* 80 S.W.3d 566 (Tex.2002). However, these cases, which deal with an employer's effort to compel arbitration of employee claims, are substantively distinguishable. Here, appellees are not bringing suit to enforce, or to void, their agreement to provide stock options to Ledig pursuant to Ledig's election. Rather, Ledig is contending that, after being given the opportunity to make an irrevocable election for tax advantages, after making that election in writing and confirming that he understood that the election was irrevocable, after subsequently being informed that he could not change his election following his transfer of employment, and after continuing to work for appellees and earning and receiving his bonus, he is now entitled to void his election and compel appellees to compensate him in cash. *J.M. Davidson* and *Halliburton* do not support Ledig's contention.

Despite Ledig's claim that appellees had the "opportunity to avoid their promises and obligations regarding stock options," either by terminating the Program or by terminating Ledig's employment, appellees honored his election and, pursuant to the terms of the Program, exchanged a portion of Ledig's bonus for stock options. Accordingly, we reject Ledig's argument concerning the illusory nature of the agreement and hold that the trial court did not err in granting summary judgment on Ledig's claims for quantum meruit and unjust enrichment on these grounds.

We overrule Ledig's second issue.

### Pro–Rated Bonus

■■■ In his third issue, Ledig contends that "fact issues surrounding [his] pro-rata award preclude a summary judgment on [his claim for] breach of contract." [8] Ledig asserts that his supervisor,

---

7. We note that employment relationships in Texas are presumed at will, and we presume, absent evidence to the contrary, that Ledig and appellees had an at-will relationship. *See Montgomery County Hosp. Dist. v. Brown,* 965 S.W.2d 501, 502 (Tex.1998).

8. In count four of his second amended petition, Ledig asserts claims of "breach of contract, unjust enrichment, and misrepresentation," arising out of his contention that he was entitled to a bonus for the full year of 2001. In his appellant's brief, Ledig

Todd Reid, assured him that he would receive a bonus from DETM for the year 2001 based on an entire year of service, despite the fact that Ledig began employment with DETM in April 2001.[9] Ledig also asserts that Reid and Tim Kramer, another employee, had previously been paid bonuses for the year 2000 based on a full year of service, even though Reid and Kramer had commenced employment with DETM in May 2000. Finally, Ledig cites an e-mail from an employee in Duke Energy's human resources department allegedly indicating that Mike Kimner, another DETM employee, was promoted in the year 2001 to the position of President of Duke Energy Merchants, a separate Duke Energy business unit, but Kimner was allowed to remain in the DETM Plan for 2001.

The "Duke Energy Services Trading Pool Plan" expressly provides that "[a]n employee hired after January 1, 2000 will be compensated with a pro-rated award based on hire date." The DETM Plan further provides

> If an employee begins employment after the commencement of a year, or an employee transfers during the year to another Duke Energy affiliate, performance achievement will be awarded pro rata. All pro rata calculations under this Plan shall be based on the amount of full-time employment completed compared to the full year.

There is nothing in the Plan providing Reid with the authority to alter the terms of the Plan. Rather, the Plan provides

> This summary states the complete Plan. Any other statements, whether verbal or written, which are inconsistent with the terms and conditions set forth in this summary, are unauthorized by the Company. Any amendments or modifications to the Plan shall be in writing and designated as such.

■■■■■ When, as here, the parties have concluded a valid integrated agreement, the parol evidence rule precludes enforcement of a prior or contemporaneous inconsistent agreement. *Gonzalez v. United Carpenters & Joiners*, 93 S.W.3d 208, 211 (Tex.App.-Houston [14th Dist.] 2002, no pet.). Parol evidence is only admissible to show "(1) the execution of a written agreement was procured by fraud, (2) an agreement was to become effective only upon certain contingencies, or (3) the

---

specifically asserts error with respect to the trial court's entry of summary judgment on his breach of contract claim; he makes absolutely no reference to his misrepresentation and unjust enrichment claims. While Ledig makes a limited reference to these claims in his reply brief, a reply brief may not be used to raise complaints not raised in the initial brief. *See* Tex.R.App. P. 38.3. Alternatively, we hold that these issues have been inadequately briefed. *See* Tex.R.App. P. 38.1. Thus, we do not address these claims.

9. Ledig also asserts that there is a fact issue concerning whether he commenced employment at DETM in April or May of 2001, and, if his bonus was properly pro-rated, whether it should have been pro-rated based on an April or May start date. *See Miller v. Riata Cadillac Co.*, 517 S.W.2d 773, 775 (Tex.1974) (stating that "an employee who is discharged without good cause prior to the time specified for payment of a bonus is entitled to recover a pro rata part of such bonus for the period he actually worked"). However, the final judgment reflects that Ledig's claim for his April 2001 bonus was settled. Appellees also assert in their brief that this issue was settled, and Ledig does not challenge this assertion in his reply brief, though he continues to assert arguments about his start date with DETM. Because the record indicates that this issue was settled by the parties, we do not consider this issue on appeal. Rather, we address Ledig's breach of contract claim arising out of his allegation that he was entitled to a bonus for the full year of 2001.

parties' true intentions if the writing is ambiguous." *Id.* Here, Ledig specifically testified that, in early 2001, in connection with his move to DETM, he spoke with Reid, his supervisor, and was assured that he would receive a bonus for the full year of 2001. Ledig is not asserting that the DETM Plan was procured by fraud, that the DETM Plan was to become effective only upon certain contingencies, or that the Plan was ambiguous. Even accepting Ledig's testimony as true, that Reid promised him that he would receive a bonus for the full year of 2001, the terms of the Plan, which expressly provide that Ledig would be entitled to a pro-rated bonus, control appellees' obligations under the Plan.[10]

In regard to appellees' alleged treatment of other employees, Ledig's assertion that Reid and Kramer were granted bonuses for the entire year of 2000 is not supported by competent summary judgment evidence.[11] Finally, the e-mail that Ledig asserts establishes that another DETM employee was permitted to participate in the DETM Plan after transferring to another Duke Energy business unit has no relevance to this case and does not support Ledig's breach of contract claim.

We hold that the trial court did not err in granting summary judgment on Ledig's breach of contract claim arising out of his allegation that he was entitled to a bonus for the full year of 2001, rather than a pro-rated bonus.

We overrule Ledig's third issue.

### Defamation

In his fourth issue, Ledig contends that "libelous statements published [ ] by appellees defamed him given that a reasonable reader could reasonably believe them to be true." In his brief, Ledig cites two statements in support of his defamation claim. First, Ledig asserts that appellees, through counsel representing them in an investigation conducted by the SEC, stated that "Duke has taken certain other personnel actions ... [and] reorganized its trading and marketing operations to ensure proper leadership and management are in place...." [12] Second, Ledig asserts that appellees published a report which provided, "Duke states that most of the senior management in the Houston office, including all who participated in the inaccurate reporting, are no longer with the company." [13] Appellees contend that the trial

---

**10.** We recognize that the parol evidence rule does not bar evidence of a collateral agreement. *Transit Enter. v. Addicks Tire & Auto Supply, Inc.,* 725 S.W.2d 459, 461 (Tex. App.-Houston [1st Dist.] 1987, no writ). A collateral agreement is one that the parties might naturally make separately, *i.e.,* one not ordinarily expected to be embodied in, or integrated with, the written agreement and not so clearly connected with the principal transaction as to be part and parcel of it. *Boy Scouts of Am. v. Responsive Terminal Sys.,* 790 S.W.2d 738, 745 (Tex.App.-Dallas 1990, writ denied). Reid's alleged promise to Ledig that he would receive a bonus under the DETM Plan for the full year of 2001, rather than a pro-rated bonus, cannot be considered collateral to the DETM Plan.

**11.** The trial court sustained appellees' objections to Ledig's testimony regarding DETM's treatment of Reid and Kramer. However, Ledig fails to reference this fact and instead cites this "evidence" in his briefing.

**12.** In his summary judgment response, Ledig asserts that this statement is contained in a letter from Duke Energy's counsel to the SEC in regard to an investigation being conducted by the SEC.

**13.** In his brief, Ledig asserts that this statement was published in the "Final Report on Price Manipulation in Western Markets, Fact Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices," prepared by the "staff of the Federal Regulatory Commission in March 2003."

court properly granted summary judgment on Ledig's defamation claim because "he had no evidence from which reasonable minds could find that [appellees] published false and defamatory statements *about him.*" (Emphasis in original).

 In order to prevail on his defamation claim, Ledig must establish that the statement referred to him. *Newspapers, Inc. v. Matthews,* 161 Tex. 284, 289, 339 S.W.2d 890, 893 (Tex.1960); *Delta Air Lines, Inc. v. Norris,* 949 S.W.2d 422, 427 (Tex.App.-Waco 1997, writ denied). A person is referred to in a defamatory statement if he is named in the statement or if those who know the person would understand that the statement was referring to the person. *Matthews,* 339 S.W.2d at 893; *Am. Broad. Cos. v. Gill,* 6 S.W.3d 19, 34 (Tex.App.-San Antonio 1999, pet. denied). Whether a plaintiff is referred to in a statement is a question of law for the court. *Am. Broad. Cos.,* 6 S.W.3d at 34. This question is submitted to a jury only if the contested language is ambiguous or of doubtful import. *See Denton Pub. Co. v. Boyd,* 460 S.W.2d 881, 884 (Tex.1970).

 Appellees' statements that Duke had "taken certain other personnel actions" and "reorganized its trading and marketing operations to ensure proper leadership and management" do not make any reference to Ledig, directly or indirectly, and are insufficient, as a matter of law, to be capable of defamatory meaning. Ledig concedes that the second statement, that "most of the senior management in the Houston office, including all who participated in the inaccurate reporting, are no longer with the company," does not directly refer to him. However, Ledig asserts that the statement refers to him

Ledig does not explain how appellees are responsible for the publication of this sec-

because "he is unquestionably a member" of Duke's senior management. Texas courts have routinely held that "a member of a group has no cause of action for a defamatory statement directed to some or less than all of a group when there is nothing to single out the plaintiff." *Eskew v. Plantation Foods, Inc.,* 905 S.W.2d 461, 462 (Tex.App.-Waco 1995, no writ); *see also Huckabee v. Time Warner Entm't Co.,* 19 S.W.3d 413, 429 (Tex.2000) (holding that family law judge could not bring defamation claim because general criticism of family law courts was not directed at particular judge). In *Eskew,* Plantation Foods conducted an investigation into irregularities in its maintenance department. 905 S.W.2d at 461. At the conclusion of the investigation, Plantation Foods fired several employees. *Id.* The local newspaper published an article in which a representative of Plantation Foods stated, "I don't think everyone we let go had something to do with this. But some of those we let go, we think, were involved." *Id.* at 462. Three employees who were terminated brought suit, alleging that although they were not named in the article, anyone knowing them would be aware that the article referred to them. *Id.* The court entered summary judgment in favor of Plantation Foods, noting that the statement did not single out the plaintiffs or "malign the entire group of persons terminated." *Id.*

Here, the statement at issue indicates that most of the senior management, including those who had engaged in the inaccurate reporting, were no longer with Duke Energy. Appellees did not assert that all who were dismissed were involved in the inaccurate reporting, and thus did not malign the entire group of persons

ond statement.

terminated. In fact, the statement suggests that those involved in the inaccurate reporting were only a subset of the senior management that were dismissed. We hold that this statement, like the first, does not refer to Ledig and is insufficient, as a matter of law, to be capable of defamatory meaning.[14] Accordingly, we hold that the trial court did not err in granting summary judgment on Ledig's defamation claim.

We overrule Ledig's fourth issue.

## Conclusion

We affirm the judgment of the trial court.

---

14. Appellees also assert that Ledig was not terminated until November 2002, well after the publication of the alleged statements in August 2002, and that the statements did not refer to Ledig, but rather to other employees, including Reid and Kramer.