IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-06-00236-CV

 

Navasota Resources, L.P.,

                                                                                                          Appellant

 v.

 

First Source Texas, Inc., First Source Gas, LP,

Gastar Exploration Texas, LLC f/k/a Bossier 

Basin, LLC, First Texas Gas, LP, First Source 

Bossier LLC, Gastar Exploration, LTD., 

Chesapeake Energy Corp., Chesapeake 

Exploration, LP & Chesapeake Operating, Inc.,

 

                                                                                                          Appellees

 

 

 



From the 12th District Court

Leon County, Texas

Trial Court No. 0-05-451

 



Opinion










 

            Navasota
Resources, L.P. filed suit to enforce a preferential right provision in a joint
operating agreement it had with First Source Texas, Inc.  The trial court
granted summary judgment motions filed by: (1) First Source, its parent company
Gastar Exploration Texas, L.P., and other related entities; and (2) Chesapeake
Energy Corp. and two related entities.  The court denied a summary judgment
motion filed by Navasota.  Navasota contends in two issues that the court erred
by: (1) granting the summary judgment motions filed by the First Source/Gastar entities
and the Chesapeake entities; and (2) denying the summary judgment motion filed
by Navasota.  We will reverse and render in part and reverse and remand in part.

Background

            The joint
operating agreement applies to certain oil and gas interests in an area of
mutual interest straddling the Navasota River along the boundary between Leon and Robertson Counties.  The parties refer to the property included in the joint operating
agreement as the “Hilltop Prospect.”  At the time the parties executed the joint
operating agreement, Navasota owned an undivided fifty-five percent working interest
in these lands, and First Source owned an undivided forty-five percent working interest. 
The operating agreement is a standard agreement, Form 610-1989, promulgated by
the American Association of Petroleum Landmen.[1]

            This agreement
contains the following provision regarding the preferential right which Navasota seeks to enforce:

            Should any party desire to sell all or
any part of its interests under this agreement, or its rights and interests in
the Contract Area, it shall promptly give written notice to the other parties,
with full information concerning its proposed disposition, which shall include
the name and address of the prospective transferee (who must be ready, willing
and able to purchase), the purchase price, a legal description sufficient to
identify the property, and all other terms of the offer.  The other parties
shall then have an optional prior right, for a period of ten (10) days after
the notice is delivered, to purchase for the stated consideration on the same
terms and conditions the interest which the other party proposes to sell; and,
if this optional right is exercised, the purchasing parties shall share the
purchased interest in the proportions that the interest of each bears to the
total interest of all purchasing parties.  However, there shall be no
preferential right to purchase in those cases where any party wishes to
mortgage its interests, or to transfer title to its interests to its mortgagee
in lieu of or pursuant to foreclosure of a mortgage of its interests, or to
dispose of its interests by merger, reorganization, consolidation, or by sale
of all or substantially all of its Oil and Gas assets to any party, or by
transfer of its interests to a subsidiary or parent company or to a subsidiary
of a parent company, or to any company in which such party owns a majority of
the stock.

 

            In September
2005, Gastar Exploration, Ltd., the parent company of First Source, signed a
letter of intent with “Chesapeake Energy Corporation and/or its affiliate
Chesapeake Exploration Limited Partnership” with three primary components:

(1)   Chesapeake would
purchase 19.9 percent of Gastar’s outstanding shares of common stock;

 

(2)   Chesapeake would purchase 33.33 percent of First
Source’s working interest in the Hilltop Prospect, while First Source would
retain 66.67 percent of its working interest; and

 

(3)   Chesapeake
and Gastar would enter an area of mutual interest (AMI) comprising thirteen
counties in East Texas.

 

            On October 18,
First Source Vice President Henry J. Hansen mailed a letter to the attention of
Mike Ellis, Vice President of Alta Mesa Resources, Inc. (Navasota’s general
partner), informing Navasota of the deal with Chesapeake.  That letter reads as
follows:

Gastar Exploration, Ltd., and its wholly owned
subsidiary First Source Gas, L.P. (collectively called Gastar), have entered
into a Letter of Intent (LOI) with Chesapeake Energy Corporation (Chesapeake)
to sell a portion of its leasehold interest in the lands subject to the
referenced Operating Agreement (Operating Agreement).  A press release is
enclosed that summarizes the LOI.  Among other specifics, Chesapeake has agreed
to purchase 1/3rd of Gastar’s net leasehold acres in the subject lands at a
cost of $700 per net acre.  In addition, Chesapeake has agreed to pay 44.44% of
the costs through casing point in the first 6 deep Bossier Test Wells, proposed
by Gastar, to earn a 33.33% working interest, proportionately reduced to
Gastar’s interest.  Currently Gastar owns 21,484 net acres in the subject
lands.  Chesapeake’s net expenditure to acquire this leasehold will be
$5,012,933 (21,484 net acres x $700 x .3333).

 

Pursuant to Article VIII. F., of the Operating
Agreement you have 10 days from the receipt of this notification to elect your
preferential right to purchase.  If you so elect you will be obligated to pay
Gastar $5,012,933 for 1/3rd of Gastar’s net leasehold acreage that is subject
to the Operating Agreement.  Further, you must elect to pay 44.44% of the costs
through casing point in the first 6 deep Bossier Test Wells, proposed by
Gastar, to earn a 33.33% working interest, proportionately reduced to Gastar’s
interest.

 

Although you have 10 days to make your decision,
Gastar and Chesapeake plan to close on October 31, 2005.  Therefore, your early
election is requested and appreciated.

 

Please make your election in the space provided
below and fax your election to my attention at [telephone number].  Please
return an original signed election to my attention by regular mail in the
enclosed envelope.

 

Hansen attached a press
release to this letter describing in more detail the tripartite agreement
between Gastar and Chesapeake.

            By letter
dated October 21, Navasota notified First Source of its intent to exercise its
preferential right.  Navasota sent a copy of its election to the number
indicated by facsimile at 2:53 p.m. and delivered the original via Federal
Express.

            Meanwhile,
First Source sent a second letter dated October 21 advising Navasota that the
October 18 “letter was erroneous.”  “Therefore First Source Gas, L.P. hereby
rescinds said notice.”  Navasota received this letter by facsimile at about
5:00 p.m. on October 21.

            Two days
later, First Source sent by facsimile a second notice letter regarding the
exercise of Navasota’s preferential right.  In this letter, First Source
explained that Navasota must comply with every aspect of the tripartite
agreement between Gastar and Chesapeake (i.e., (1) the stock purchase;
(2) the net acreage purchase with additional drilling costs; and (3) entry into
the 13-county AMI) if Navasota intended to exercise its preferential right. 
Navasota refused to accept First Source’s “modified” offer and insisted that
the parties had a binding contract based on Navasota’s acceptance of the terms
set forth in the October 18 notice letter.  In response, Gastar acknowledged by
letter dated October 28 that it had received Navasota’s purported acceptance
letter dated October 21 (on Monday morning, October 24) but insisted that “Gastar
had every right to rescind the ambiguous notice.”  Thus, Gastar refused to
close the deal which Navasota sought.  Instead, Gastar and Chesapeake closed on
their agreement on November 4.

The Litigation

            Navasota filed suit on October 31.[2]  By
its third amended petition, Navasota alleged claims for breach of contract, suit to quiet title, trespass to try
title, tortious interference with contract, conversion, money had and received,
and declaratory relief.  In
particular, Navasota sought (1) specific performance of its preferential right,
(2) to quiet title to the Hilltop Prospect, and (3) damages.  Gastar (and First
Source as its subsidiary) generally denied Navasota’s allegations and alleged
several affirmative defenses.  Chesapeake answered in similar fashion.

            Chesapeake filed the first summary judgment motion.[3] 
Chesapeake alleged in this motion: (1) Navasota’s preferential right under the
joint operating agreement was not invoked by the Gastar-Chesapeake transaction;
(2) if Navasota’s preferential right was invoked, Navasota failed to accept the
offer because it failed to accept all of the terms and conditions of the
Gastar-Chesapeake agreement; and (3) if Navasota’s acceptance was valid, the
preferential right provision constitutes an unreasonable restraint on
alienation.

            Gastar moved
for summary judgment on the ground that Navasota failed to properly exercise
its preferential right because it failed to accept all of the terms and
conditions of the Gastar-Chesapeake agreement.

            Finally,
Navasota moved for summary judgment on the grounds that: (1) Navasota properly
exercised its preferential right; (2) First Source breached the preferential
right provision of the joint operating agreement; (3) the October 18 notice
letter created a binding option in Navasota’s favor which First Source could
not rescind; (4) First Source could not change the terms of the option created
by the October 18 notice letter; (5) First Source cannot require Navasota to
purchase shares of Gastar stock or enter the 13-county AMI to exercise its
preferential right; and (6) Navasota is entitled to specific performance.

              The trial
court granted Gastar’s and Chesapeake’s summary judgment motions and denied Navasota’s.  The court did not specify the basis for its rulings.

Standard of Review

            We conduct a de
novo review of a summary judgment.  Valence Operating Co. v.
Dorsett, 164 S.W.3d 656, 661 (Tex. 2005).  To prevail on a traditional
summary judgment motion, the movant must demonstrate that there are no genuine
issues of material fact and that it is entitled to judgment as a matter of
law.  See Diversicare Gen. Partner, Inc. v. Rubio, 185 S.W.3d 842, 846 (Tex. 2005).  “[W]e take as true all competent evidence favorable to the nonmovant, and we
indulge every reasonable inference and resolve any doubts in the nonmovant’s
favor.”   Id.

            When competing
motions for summary judgment are filed and some are granted while others
denied, the general rule is that the appellate court should determine all
questions presented and render the judgment the trial court should have
rendered.  Tex. Workers’ Comp. Comm’n v. Patient Advocates of Tex., 136 S.W.3d 643, 648 (Tex. 2004); Am. Hous. Found. v. Brazos County Appraisal
Dist., 166 S.W.3d 885, 887 (Tex. App.—Waco 2005, pet. denied).  However, this
rule applies only when both (or all) parties’ motions sought a final judgment,
namely, relief on all pending claims.[4]  See
CU Lloyds of Tex. v. Feldman, 977 S.W.2d 568, 569 (Tex. 1998) (per curiam);
Am. Hous. Found., 166 S.W.3d at 887; Krishnan v. Law Offices of Preston Henrichson, P.C., 83 S.W.3d 295, 303 (Tex. App.—Corpus Christi 2002, pet.
denied).

            When the
parties file competing summary judgment motions but one side seeks a final
judgment while the other seeks only a partial summary judgment, if the trial court
renders a final judgment then the appellate court may review the propriety of
the court’s rulings on both motions.  See, e.g., CU Lloyd’s of Tex., 977
S.W.2d at 569; Bowman v. Lumberton Indep. Sch. Dist., 801 S.W.2d 883,
889 (Tex. 1990).  In this situation, if the motion for partial summary judgment
includes a claim for declaratory relief, an appellate court may render judgment
for declaratory relief on liability alone then remand the case to the trial
court for further proceedings.  Id.

Preferential Rights in General

            Generally, a
preferential right to purchase requires the owner of the subject property to
offer the property first to the holder of the right on the same terms and
conditions offered by a third party.  City of Brownsville v. Golden Spread
Elec. Coop., 192 S.W.3d 876, 880 (Tex. App.—Dallas 2006, pet. denied); McMillan
v. Dooley, 144 S.W.3d 159, 171 (Tex. App.—Eastland 2004, pet. denied); Gary
B. Conine, Property Provisions of the Operating Agreement—Interpretation,
Validity, and Enforceability, 19 Tex.
Tech. L. Rev. 1263, 1323 (1988).  When the property owner gives notice
of his intent to sell, the preferential right ripens or matures into to an
enforceable option.  City of Brownsville, 192 S.W.3d at 880; Abraham
Inv. Co. v. Payne Ranch, Inc., 968 S.W.2d 518, 524 (Tex. App.—Amarillo 1998, pet. denied); Conine, 19 Tex. Tech.
L. Rev. at 1323.  The terms of the option are formed by the provisions
granting the preferential right to purchase and the terms and conditions of the
third-party offer.  See City of Brownsville, 192 S.W.3d at 880; see
also W. Tex. Transmission, L.P. v. Enron Corp., 907 F.2d 1554, 1565 (5th
Cir. 1990); Fasken Land & Minerals, Ltd. v. Occidental Permian Ltd.,
225 S.W.3d 577, 589 (Tex. App.—El Paso 2005, pet. denied); Conine, 19 Tex. Tech. L. Rev. at 1323.  After the
property owner gives the rightholder notice of his intent to sell, the terms of
the option cannot be changed for as long as the option is binding on the
property owner.  See City of Brownsville, 192 S.W.3d at 880; Abraham
Inv. Co., 968 S.W.2d at 525; Conine, 19 Tex.
Tech. L. Rev. at 1323.

            The
rightholder’s exercise of the option must be unqualified, unambiguous, and
strictly in accordance with the terms of the agreement.  See City of Brownsville, 192 S.W.3d at 880; Comeaux v. Suderman, 93 S.W.3d 215, 220 (Tex. App.—Houston [14th Dist.] 2002, no pet.); Conine, 19 Tex.
Tech. L. Rev. at 1323.  The rightholder must accept all the terms of the
offer, or the offer will be considered rejected.  See City of Brownsville, 192 S.W.3d at 880; see also Comeaux, 93 S.W.3d at 220; Conine, 19 Tex. Tech. L. Rev. at 1323-24.  When
the rightholder gives notice of his intent to accept the offer and exercise his
option, a binding contract is created between the rightholder and the property
owner.  City of Brownsville, 192 S.W.3d at 880; Abraham Inv. Co.,
968 S.W.2d at 525.

Invocation of Preferential Right

            Navasota contends in issue I(C) that the preferential right provision of the joint
operating agreement was invoked notwithstanding that the Gastar-Chesapeake
transaction was a “package deal” involving more properties than just the working
interests which were the subject of the joint operating agreement.

            According to
the majority rule, a third party’s offer to purchase property subject to a
preferential right provision as part of a package deal involving multiple
properties or a larger tract of land does not invoke the preferential right
provision.  See Sawyer v. Firestone, 513 A.2d 36, 39-40 (R.I. 1986). 
The primary authority cited for this position is the decision of the Superior
Court of New Jersey, Appellate Division, in Guaclides v. Kruse.  67 N.J.
Super. 348, 170 A.2d 488, 493 (N.J. Super. Ct. App. Div. 1961).[5] 
According to the court in Guaclides, “[a]n attempt to sell the whole may
not be taken as a manifestation of an intention or desire on the part of the
owner to sell the smaller optioned part so as to give the optionee the right to
purchase the same.”  Id.

                Conversely,
courts in other states have held that a preferential right is invoked by such
package transactions.  The most often cited decision for this position is that
of the Michigan Supreme Court in Brenner v. Duncan.  381 Mich. 1, 27 N.W.2d 320, 322 (1947).[6]  As
an example of the reasoning for this line of cases, the Supreme Court of North
Dakota explained:

we
conclude that an intention to sell a larger parcel of land, including a tract
under lease to a tenant, is evidence of an intention to sell the leased
premises, even where no separate apportionment of value is made by owner and
purchaser.  To conclude otherwise would permit an owner and prospective
purchaser to, in effect, destroy a bargained-for purchase preemption before the
expiration of the term for which such preemption was obtained.

 

Berry-Iverson Co. of N.D. v. Johnson, 242 N.W.2d
126, 134 (N.D. 1976).

Courts in some states apparently differentiate
between package transactions which include different (but sometimes related)
properties and those which include a larger tract of land which the premises
subject to the preferential right are located within.  Compare Boyd &
Mahoney v. Chevron U.S.A., 419 Pa. Super. 24, 614 A.2d 1191, 1194-95 (1992)
(specific performance awarded for multi-state, multi-asset transaction); with
L.E. Wallach, Inc. v. Toll, 381 Pa. 423, 113 A.2d 258, 260-61 (1955) (preferential
right not invoked by transaction involving three adjoining lots only one of
which was subject to preferential right); and Williams Gas Processing v.
Union Pac. Res. Co., 2001 WY 57, 25 P.3d 1064, 1071-73 (2001) (specific
performance awarded for multi-asset transaction); with Chapman v. Mut. Life
Ins. Co. of N.Y., 800 P.2d 1147, 1150-51 (Wyo. 1990) (preferential right
not invoked by transaction involving 273 acres of which 22.6 was subject to
preferential right).[7]

            Texas courts almost uniformly have followed the Brenner line of cases.  See
McMillan, 144 S.W.3d at 178-79 (preferential right provision of oil and gas
lease invoked by transaction involved that lease and two others); Riley v.
Campeau Homes (Tex.), Inc., 808 S.W.2d 184, 188-89 (Tex. App.—Houston [14th Dist.] 1991, writ dism’d by agr.) (preferential right provision of
condominium unit lease invoked by “bulk sale” of that unit and 24 others); Foster
v. Bullard, 496 S.W.2d 724, 735-36 (Tex. Civ. App.—Austin 1973, writ ref’d
n.r.e.) (preferential right provision for 48-acre tract invoked by sale of 2,487-acre
ranch which included the smaller tract); contra Hinds v. Madison, 424
S.W.2d 61, 63-64 (Tex. Civ. App.—San Antonio 1967, writ ref’d n.r.e.) (sale of
14,800-acre ranch did not invoke lessee’s preferential right under grazing
lease for 2,800-acre portion of ranch).

            Therefore, we
hold that the Gaspar-Chesapeake proposal invoked Navasota’s preferential right
because the proposal included the sale of First Source’s working interest in
the net acreage subject to the joint operating agreement in addition to the
sale of other assets.  See McMillan, 144 S.W.3d at 178-79; Riley,
808 S.W.2d at 188-89; Foster, 496 S.W.2d at 735-36.

Terms and Conditions

            Navasota
contends in issue I(A) that First Source cannot require Navasota to purchase
the shares of Gastar common stock or enter the 13-county AMI to exercise its
preferential right.

            The
preferential right provision states that a party which desires to exercise that
right must agree to purchase the interest being sold “on the same terms and
conditions” as a third party has agreed to purchase that interest.  Gastar and Chesapeake argue that the stock purchase and entry into the 13-county AMI are additional
“terms and conditions” for the purchase of the Hilltop Prospect working
interest.  Navasota responds that these are not “terms and conditions” of the
Hilltop Prospect transaction but rather separate transactions included within
the overall Gastar-Chesapeake deal.

The terms
of the option are formed by the provisions granting the preferential right to
purchase and the terms and conditions of the third-party offer.  See City of
 Brownsville, 192 S.W.3d at 880; see also W. Tex. Transmission, 907
F.2d at 1565; Fasken Land & Minerals, 225 S.W.3d at 589; Conine, 19 Tex. Tech. L. Rev. at 1323.

            Virtually
every authority of which we are aware agrees that the holder of a preferential
right cannot be compelled to purchase assets beyond those included within the
scope of the agreement subject to the preferential right in order to exercise
that right.  See McMillan, 144 S.W.3d at 179; Comeaux, 93 S.W.3d at
221 n.2; Hinds, 424 S.W.2d at 64.[8] 
Gastar and Chesapeake refer to the Fifth Circuit’s decision in West Texas
Transmission in which the court cited numerous authorities regarding
various “non-price conditions” which “courts have insisted that [preferential
right holders] replicate” to enforce their preferential rights.  907 F.2d at
1564.  In particular, Gastar and Chesapeake call attention to two of the
authorities cited by the Fifth Circuit which the preferential right holders
were required to replicate; (1) “additional partnership and land development
obligations”; Id. (citing Prince v. Elm Inv. Co., 649 P.2d 820,
823-26 (Utah 1982)); and (2) “the purchase of a larger quantity of land.”  Id. (citing Crow-Spieker #23 v. Robert L. Helms Constr. & Dev. Co., 103 Nev. 1, 731 P.2d 348, 350 (1987) (per curiam)).

            West Texas
Transmission and Prince are distinguishable from the facts of this
case.  The former involved Valero Transmission Company’s[9]
preferential right to repurchase a one-half interest in the TransTexas Natural
Gas Pipeline if Enron Corporation[10]
chose to sell it.  Id. at 1556.  Enron negotiated a deal to sell 100
percent of its stock in a subsidiary, including the pipeline interest, to TECO
Pipeline Company.  Id. at 1557.  Because of the ongoing involvement of
the Federal Trade Commission in these pipeline transactions and various mergers
and acquisitions, Enron included FTC approval as a condition of the deal with
TECO.  Id. at 1556-57.  Enron notified Valero of the deal, and Valero
elected to exercise its preferential right by purchasing the stock being
offered to TECO.[11]  Id. at 1558.  However, Valero informed Enron that it would not comply with the
requirement that FTC approval be obtained.  Id. at 1558-59.  When the
FTC rejected the proposed sale to Valero but ratified the proposed sale to
TECO, Valero sought a temporary injunction in court, but after a trial on the
merits, the federal district court rendered judgment in Enron’s favor.  Id. at 1559-61.  The Fifth Circuit likewise rejected Valero’s position, and held
that Valero had to satisfy the condition of FTC approval because it was
“commercially reasonable, imposed in good faith, and not specifically designed
to defeat Valero’s preemptive rights.”  W. Tex. Transmission, 907
F.2d at 1563.      Thus, West Texas Transmission is distinguishable
because it involved the conveyance of a single asset rather than a package deal
involving multiple assets.  See McMillan, 144 S.W.3d at 177.  West
Texas Transmission is also distinguishable because the condition at issue
(FTC approval) directly related to the sale of the interest in the pipeline as
opposed to some unrelated asset.

              In Prince,
the dispute centered on a single tract of land (subject to the plaintiff’s
preferential right) which the defendant contributed to a partnership as part of
the consideration for acquiring an interest in the partnership.  See Prince,
649 P.2d at 821.   Thus, Prince is distinguishable for the same reason
as West Texas Transmission.

            With regard to
Crow-Spieker, we first observe that the portion of the decision cited by
the Fifth Circuit was the Nevada court’s “alternative” holding.  See
Crow-Spieker, 731 P.2d at 350.  Nevertheless, to the extent that this
alternative holding supports Gastar’s and Chesapeake’s position, this holding
is contrary to the greater weight of authority on this particular issue.  See
McMillan, 144 S.W.3d at 179; Comeaux, 93 S.W.3d at 221 n.2; Hinds,
424 S.W.2d at 64; accord Panther Pride Enters., Inc. v. Stop & Shop Cos.,
806 F.2d 1227, 1229 (4th Cir. 1986); Johnnies Pelham Rd. Serv., Inc. v.
Thomas, 26 A.D.3d 414, 809 N.Y.S.2d 561, 563 (N.Y. App. Div. 2006); L.E.
Wallach, 113 A.2d at 260; Landa v. Century 21 Simmons & Co., 237
 Va. 374, 377 S.E.2d 416, 421 (1989); see also Straley v. Osborne, 256
Md. 514, 278 A.2d 64, 70 n.8 (1971); Guaclides, 170 A.2d at 493.

            Therefore, we
hold as a matter of law that First Source could not require Navasota to
purchase the shares of Gastar common stock or enter the 13-county AMI to
exercise its preferential right.

Notice to Navasota

            Navasota
contends in issues I(B) and II(A) that First Source’s October 18 notice and
Navasota’s response created a binding contract for Navasota’s purchase of 33.33
percent of the working interest First Source held in the Hilltop Prospect.

            First Source
apparently recognized that Navasota’s preferential right had been invoked
because it notified Navasota on October 18 that Navasota had ten days to decide
whether to exercise this right.  Specifically, First Source advised Navasota
that it must pay $5,012,933 for the working interest which First Source was offering
to Chesapeake and 44.44 percent of the drilling costs “through casing point in
the first 6 deep Bossier Test Wells.”  Navasota responded within the time
period specified that it intended to exercise its preferential right by
satisfying these two requirements.

            However, First
Source sought to rescind its initial notice and include as additional terms and
conditions the purchase of Gastar stock and entry into the 13-county AMI.  But
see City of Brownsville, 192 S.W.3d at 880 (“the terms of the option cannot
be changed for as long as the option is binding on the property owner”); Abraham
Inv. Co., 968 S.W.2d at 525 (same).  As we have already determined, these
were not conditions which First Source could require Navasota to satisfy to
exercise its preferential right.

            Therefore,
when Navasota notified First Source of its acceptance of the two terms and
conditions initially specified for the purchase of 33.33 percent of First
Source’s working interest in the Hilltop Prospect, a binding contract for sale
was created.  Id.

Unreasonable Restraint on Alienation

            Navasota contends in issue I(D) that the preferential right provision does not place an
unreasonable restraint on alienation.  Gastar and Chesapeake both cite the Restatement
of Property and Texas cases relying on the Restatement as establishing the
principles applied in Texas with regard to restraints on alienation.  They
contend that under these principles Navasota’s preferential right constitutes
an unreasonable restraint on alienation.

            Gastar and Chesapeake are correct that Texas courts have looked to the Restatement to determine
issues regarding alleged restraints on alienation.  See, e.g., Sonny Arnold,
Inc. v. Sentry Sav. Ass’n, 633 S.W.2d 811, 813-15 (Tex. 1982) (citing Restatement of Prop. § 404 (1944)); Reagan
Nat’l Adver. of Austin, Inc. v. Capital Outdoors, Inc., 96 S.W.3d 490, 494
(Tex. App.—Austin 2002, pet. denied) (same);  Randolph v. Terrell, 768
S.W.2d 736, 738-39 & nn.1, 3 (Tex. App.—Tyler 1987, writ denied) (citing Restatement (Second) of Prop.: Donative
Transfers §§ 3.1-3.4, 4.2(3), 4.4 (1983)); Perritt Co. v. Mitchell,
663 S.W.2d 696, 698 (Tex. App.—Fort Worth 1983, writ ref’d n.r.e.) (citing Restatement of Prop. § 413 (1944)).  We
shall do so as well.

            Section 404 of
the Restatement defines a restraint on alienation in part as “an attempt by an
otherwise effective conveyance or contract to cause a later conveyance . . . to
impose contractual liability on the one who makes the later conveyance when
such liability results from a breach of an agreement not to convey; or . . . to
terminate or subject to termination all or part of the property interest
conveyed.”  Restatement of Prop.
§ 404(1)(b), (c).  The Restatement specifically defines the sort of
preferential right sought to be enforced by Navasota as a “promissory
restraint” on alienation.  Id. § 413(1) & cmt. a; see Perritt Co.,
663 S.W.2d at 698.

            The provisions
of the original Restatement regarding restraints on alienation have been
significantly reworked in the Restatement (Third) but with little apparent
effect on the result in this case.[12] 
Section 3.1(3) provides that a “servitude”[13] is
invalid as violative of public policy of it “imposes an unreasonable restraint
on alienation under § 3.4 or § 3.5.”  Restatement
(Third) of Prop.: Servitudes § 3.1(3) (2000).  Section 3.4 provides:

            A servitude that imposes a direct
restraint on alienation of the burdened estate is invalid if the restraint is
unreasonable. Reasonableness is determined by weighing the utility of the
restraint against the injurious consequences of enforcing the restraint.

 

Id. § 3.4 (2004).  Comment f then directly addresses
the type of preferential right which Navasota seeks to enforce.

            If the right to purchase is on the
same terms and conditions as the owner may receive from a third party, if the
procedures for exercising the right are clear, and if the period within which
it must be exercised is relatively short, the right of first refusal is valid
unless the purpose is not legitimate. Since the practical effect of the
restraint on alienability is minimal, duration of the first-refusal right
should not affect validity.

 

Id. cmt. f; accord Restatement of Prop. § 413 cmt. c.[14]

            Consistent
with the Restatement, Texas courts have without exception upheld provisions
like the one at issue here as reasonable restraints on alienation.  See
Peritt Co., 663 S.W.2d at 698-99; Forderhause v. Cherokee Water Co.,
623 S.W.2d 435, 438-39 (Tex. Civ. App.—Texarkana 1981), rev’d on other
grounds, 641 S.W.2d 522 (Tex. 1982); see also John R. Reeves, The
Development of the Model Form Operating Agreement: An Interpretive Accounting,
54 Okla. L. Rev. 211, 280-81
(2001); Harlan Abright, Comment, Preferential Right Provisions and
Their Applicability to Oil and Gas Instruments, 32 Sw. L.J. 803, 807-08 (1978); Harry M. Reasoner, Preferential
Purchase Rights in Oil and Gas Instruments, 46 Tex. L. Rev. 57, 60-65 (1967).  This position is likewise
consistent with that taken by most other jurisdictions.[15]

            Accordingly,
we hold that the preferential right provision at issue does not constitute an
unreasonable restraint on alienation.

Mutual or Unilateral Mistake, Unconscionability

Navasota
contends in issue II(D) that Gastar’s and Chesapeake’s defenses of mutual
mistake and unilateral mistake and Gastar’s related claim of unconscionability
fail as a matter of law.

A party
relying on the affirmative defense of mutual mistake must establish “what the
parties’ true agreement was and that the instrument incorrectly reflects that
agreement because of a mutual mistake.”  Atl. Lloyds Ins. Co. v. Butler, 137 S.W.3d 199, 213 (Tex. App.—Houston [1st Dist.] 2004, pet. denied); accord
N. Nat. Gas Co. v. Chisos Joint Venture I, 142 S.W.3d 447, 456 (Tex.
App.—El Paso 2004, no pet.).  For unilateral mistake, a party must establish among
other things[16] that
“the mistake is of so great a consequence that to enforce the contract would be
unconscionable.”  Ledig v. Duke Energy Corp., 193 S.W.3d 167, 175 (Tex. App.—Houston [1st Dist.] 2006, no pet.); N. Nat. Gas Co., 142 S.W.3d at 456.  A
“unilateral mistake by one party, combined with knowledge of that mistake by
the other party, is equivalent to mutual mistake.”  Atl. Lloyds Ins. Co.,
137 S.W.3d at 213.

The key
to mutual or unilateral mistake is the existence of an actual mistake on
the part of one or both parties to a contract.  Here, Gastar’s and Chesapeake’s
claim of mistake hinges on their presupposition that they may be held to the
terms of the October 18 notice letter because of Navasota’s acceptance of those
terms, even if those terms were not correctly stated.

However,
we have already determined that, under the terms of the Gastar-Chesapeake
transaction and the language of the preferential right provision in the joint
operating agreement, the only terms and conditions which Navasota had to meet
were the $700-per-net-acre price and the additional drilling expenses.  The
October 18 notice letter accurately stated these two terms and conditions, and Navasota accepted them.  Therefore, Gastar’s and Chesapeake’s claims of mutual or
unilateral mistake must fail.

Gastar
also argued in its response to Navasota’s summary judgment motion that it would
be unconscionable to enforce the parties’ agreement for $700 per net acre. 
Gastar cites two cases for the proposition that a mistake in a contract may
render enforcement of the contract unconscionable even though the contract is
otherwise enforceable.  See Florsheim Co. v. Miller, 575 F. Supp. 84, 84-85
(E.D. Tex. 1983) ($1 million mistake in construction bid); B.D. Holt Co. v.
OCE, Inc., 971 S.W.2d 618, 620 (Tex. App.—San Antonio 1998, pet. denied)
($100,000 mistake).  Gastar’s argument in this regard is based on circular
logic and not a separate claim of procedural or substantive unconscionability. 
See, e.g., In re Palm Harbor Homes, Inc., 195 S.W.3d 672, 677 (Tex. 2006) (orig. proceeding).  The cited cases by Gastar both address “unconscionability”
in terms of the first element of a claim of unilateral mistake, i.e.,
“the mistake is of so great a consequence that to enforce the contract would be
unconscionable.”  See Florsheim Co., 575 F. Supp. at 85; B.D. Holt
Co., 971 S.W.2d at 620; see also Ledig, 193 S.W.3d at 175 (listing
elements for unilateral mistake); N. Nat. Gas Co., 142 S.W.3d at 456
(same).

We have
already determined that there was no mistake.  Therefore, there logically could
be no mistake which rendered enforcement of the preferential right provision unconscionable.

 

Breach of Contract

            Navasota contends in issue II(B) that First Source breached the parties’ contract by
failing to honor the preferential right provision.

            To establish a
breach-of-contract claim, a plaintiff must show: (1) a valid contract; (2) the plaintiff
performed or tendered performance; (3) the defendant breached the contract; and
(4) the plaintiff suffered damages as a result of the breach.  Critchfield
v. Smith, 151 S.W.3d 225, 233 (Tex. App.—Tyler 2004, pet. denied); Runge
v. Raytheon E-Sys., Inc., 57 S.W.3d 562, 565 (Tex. App.—Waco 2001, no
pet.).

            Here, when Navasota notified First Source of its acceptance of the two terms and conditions initially
specified for the purchase of 33.33 percent of First Source’s working interest
in the Hilltop Prospect, a valid contract for sale was created.  See City of Brownsville, 192 S.W.3d at 880; Abraham Inv. Co., 968 S.W.2d
at 525.  Navasota tendered performance of these two terms and conditions, but
First Source refused to honor the contract.  Navasota suffered damages because
of First Source’s breach because it was not allowed to exercise its
bargained-for preferential right and was denied ownership of the disputed
working interest which First Source instead conveyed to Chesapeake.

            Accordingly, Navasota conclusively established that First Source breached the parties’ contract.

Specific Performance

            Navasota contends in issue II(C) that it is entitled to specific performance because of First
Source’s breach.  Gastar and Chesapeake respond that Navasota is not entitled
to specific performance because a genuine issue of material fact remains
concerning the “true value” of the working interest which Navasota seeks to
obtain.

            Gastar and Chesapeake contend that “the value of the Hilltop Prospect is substantially higher that
that reflected in the letter of intent.”  According to them, this higher value
was accounted for by the other terms of the Gastar-Chesapeake transaction (i.e.,
the stock purchase and the 13-county AMI).

            Several courts
in other jurisdictions agree with Gastar’s and Chesapeake’s position.  This
line of cases is perhaps best encapsulated by the opinion of the Fourth Circuit
in Pantry Pride Enterprises, Inc. v. Stop & Shop Cos.  806 F.2d 1227
(4th Cir. 1986).  As that court observed:

allocations of price to elements of a package may
readily be manipulated to defeat contractual rights of first refusal.  It
is easy to imagine an unreasonably inflated value assigned to the subject of
any first-refusal option.  In such a case, courts would recognize what is
apparent here: that the value assigned to the separate elements of a deal may
have little meaning and that the value of the total package alone reflects
arms-length negotiations and a fair market price.

 

Id. at 1231-32.            

            Pantry
Pride involved a $9.8 million acquisition of twenty grocery stores (all of
which were apparently located on leased premises) along with the equipment in
those stores.  In the agreement, the total purchase price was allocated among
the twenty stores and a further allocation was made with respect to each store
so that 75 percent of the purchase price was allocated to the equipment and 25
percent to the lease.  Id. at 1228.  The dispute in this particular case
involved one store for which the allocated price was $571,000 ($428,500 for
equipment and $142,750 for the lease).  Id.

            The owner of
the shopping center (Stop & Shop) sought to exercise its right of first
refusal for $142,750.  The Fourth Circuit affirmed the district court’s
decision that Stop & Shop was entitled to specific performance.  Id. at 1229-31.  However, it rejected Stop & Shop’s contention that Pantry Pride
should be made to assign the lease for the allocated price of $142,750.  Id. at 1231-32.

            Having rejected the artificial value,
one could determine the offering price for the leasehold either by reallocating
the total $9.8 million purchase price or by dividing the $571,000 purchase
price between the lease and equipment according to their respective values.

 

            The first approach has significant
practical problems because it would require the district court to allocate the
$9.8 million to the twenty different leases and the various equipment bought by
 Richmond.  Further, use of the $9.8 million figure is inappropriate because,
as Pantry Pride agrees, Richmond offered to buy the Norfolk store for $571,000.
 In its February 1985 notice to Stop & Shop, Pantry Pride stated that the
terms and conditions of the Richmond offer were the purchase of the entire
supermarket for $571,000.  Because the $571,000 figure represents the price
offered by Richmond for the lease and equipment, the task is to determine what
portion of this purchase price was for the leasehold.

 

            On remand, the parties should submit
to the district court evidence of the value of the entire supermarket at the
time of the offer and evidence of what percentage of that value was fairly
attributable to the lease.  Once this percentage is determined, it should be
applied to the $571,000 offering price to ascertain what percentage of the
offering price was offered for the lease.  Under this approach, Stop & Shop
may still receive a windfall, since the $571,000 purchase price for the Norfolk
store in question may have been lowered in order to consummate the complete
twenty-store transaction.  Any windfall to Stop & Shop in this instance,
however, is balanced by the benefits to Pantry Pride from the form that the
transaction took.

 

            We believe that this course strikes an
equitable balance between the value of Stop & Shop's contractual option,
the need to facilitate transactions in commercial real estate, and the need to
present upon remand a problem of manageable proportions to the district court.
As the option holder, Stop & Shop may always refuse the offering price
established in the remand proceedings. Our holding also leaves parties free to
structure future first-refusal options in any way they like.  Only where a
contract fails to speak plainly to the circumstances, may courts attempt to
construe the parties’ true intent.

 

Id. at 1232.

            Some courts
have agreed with this approach.  See Gleason v. Norwest Mortgage, Inc.,
243 F.3d 130, 142-43 (3d Cir. 2001); Wilber Lime Prods., Inc. v. Ahrndt,
268 Wis. 2d 650, 673 N.W.2d 339, 342-43 (Wis. Ct. App. 2003); Shell Oil Co.
v. Trailer & Truck Repair Co., 828 F.2d 205, 208-10 (3d Cir. 1987).

            Other courts
have held that the seller should be held to the allocated price absent affirmative
evidence of bad faith or of some other improper basis for the allocated price. See
In re Adelphia Communications Corp., 368 B.R. 348, 356-58 (Bankr. S.D.N.Y.
2007); Park Plaza, Ltd.. v. Pietz, 193 Cal. App. 3d 1414, 239 Cal. Rptr.
51, 54-55 (Cal. Ct. App. 1987); Uno Rests., Inc. v. Boston Kenmore Realty
Corp., 441 Mass. 376, 805 N.E.2d 957, 962-64 (2004); Unlimited Equip.
Lines, Inc. v. Graphic Arts Ctr., Inc., 889 S.W.2d 926, 939 (Mo. Ct. App.
1994); Berry-Iverson Co., 242 N.W.2d at 134-36; Samson Res. Co. v.
Amerada Hess Corp., 2002 OK CIV APP 32, 41 P.3d 1055, 1059 (2001); Boyd
& Mahoney, 614 A.2d at 1195; Rappaport v. Banfield, 2007 VT 25,
924 A.2d 72, 78-80 (2007).

            The California
Court of Appeal seemed to best summarize this line of cases by the following
observation, “To reject the allocation concept because of possible abuse, where
actual abuse can be adjudicated and defused, is to throw out the baby with the
bath water.”  Park Plaza, 239 Cal. Rptr. at 55.

            The only Texas decisions which have addressed valuation appear to follow this approach.  In Riley,
a condominium lessee’s preferential right was invoked by the lessor’s sale of
the condominium building for a price of $76.20 per square foot.  See Riley,
808 S.W.2d at 185, 188.  The court held that the lessee was entitled to
exercise his preferential right at that same price.  Id. at 187-88. 
However, Riley is arguably different from the case at bar because the
condominium units under consideration in that case were presumably of
relatively equal value, while in the present case we are concerned with a
multi-part transaction involving distinct assets.

            Somewhat
closer to the facts of this case are those presented in Foster.  There,
Foster held a right of first refusal on an approximately 48-acre tract of land
adjoining a 30-acre tract which he already owned.  See Foster v. Bullard,
554 S.W.2d 66, 67 (Tex. Civ. App.—Austin 1977, writ ref’d n.r.e.).[17] 
Bullard sold the 48-acre tract as part of a 2,487-acre ranch for $650 per
acre.  Id. at 67-69.  Because Foster’s contract required him to pay an
amount “consistent with [a third party’s] offer” “but not less than $750.00 per
acre” to exercise his right of first refusal, Foster sought to exercise his
right of first refusal for the 48-acre tract at $750 per acre.  Id. at 66-67.  Bullard argued, however, that the 48-acre tract was actually worth
$3,000 per acre.  In fact, Bullard had notified Foster that he must pay $3,000
per acre to exercise his right of first refusal.  Id. at 68.  In
addition to this notice, the other evidence relied on by Bullard was: (1) he
had previously negotiated with a potential buyer to sell the 48-acre tract as
part of a 164-acre tract for $3,000-$3,500 per acre; and (2) the potential
buyer and he had operated under a mistaken assumption that this tract of land
had frontage on Barton Creek.  Id. at 67.

            The Austin court held that Foster was entitled to exercise his right of first refusal at $750
per acre.  Id. at 71.  The court observed that Bullard’s prior
negotiations were superseded by the actual terms agreed to in the contract and
that there was no evidence in the record to support Bullard’s contention that
the eventual purchaser assigned a higher per acre value to the 48-acre tract
than to the remainder of the acreage.  Id.

            The only
summary judgment evidence in the record regarding the assigned price of $700
per net acre is found in Gastar’s response to Navasota’s summary judgment
motion.  In an affidavit attached to this response, Gastar president and CEO
Russell Porter stated that this per acre price “did not reflect the true value
of the acreage and was discounted as a result of the other terms, namely the
stock purchase and the AMI commitment.”  Porter likewise stated:

            If Gastar had decided to negotiate and
enter a contract for the sale of a portion of its leasehold working interest in
the Hilltop Prospect without the consideration supplied by the other two
principal terms (the stock purchase and AMI), Gastar would not have agreed to
sell such leasehold interest for $700 per acre.  On the contrary, the true
value of such acreage is substantially higher, and this higher value was
accounted for by the other two terms of the Letter of Intent.

 

            Gastar and Chesapeake argue that awarding specific performance to Navasota at $700 per net acre will
result in Navasota being permitted to exercise its preferential right with
regard to the Hilltop Prospect by paying less than the “true value” of First
Source’s working interest.  While this may be correct, the preferential right
provision agreed to by the parties does not require the preferential right
holder to pay “true value” or fair market value.  Rather, the preferential
right provision requires only that the holder match the third-party offer.

            Finally, we
observe that Navasota is entitled to obtain specific performance from Chesapeake because Chesapeake stands in the shoes of First Source as a purchaser with
notice of Navasota’s preferential right.  Abraham Inv. Co., 968 S.W.2d at
527.

            Accordingly,
we hold that Navasota conclusively established its entitlement to specific
performance of its preferential right by payment of $5,012,933 (21,484 net
acres x $700 per net acre x .3333 interest) and 44.44 percent of the costs
through casing point in the first 6 deep Bossier Test Wells in the Hilltop
Prospect.

Conclusion

Navasota established its entitlement to judgment as a
matter of law on its claims for breach of contract and for declaratory relief
in the form of specific performance.  Navasota
requests in its prayer for relief that this Court: (1) reverse and render “on
its claims for breach of contract and declaratory judgment” and (2) reverse and
remand “for the limited purpose of determining Navasota’s recoverable
attorney’s fees and costs and any amount of revenues owed to Navasota for the
period of time since Navasota exercised its preferential right.”  Because Navasota sought only a partial summary
judgment,[18] we
will reverse the judgment of the trial court, render judgment in Navasota’s favor on its claims for breach of contract and specific performance, and remand
this cause to the trial court for further proceedings consistent with this
opinion.

 

FELIPE REYNA

Justice

 

Before Chief Justice
Gray,

Justice
Vance, and

Justice
Reyna

(Chief
Justice Gray not participating)

Reversed and rendered in
part,

            Reversed and
remanded in part

Opinion delivered and
filed January 9, 2008

[CV06]            









[1]
              The 1989 version of Form 610
is the most recent version of the Model Form Operating Agreement promulgated by
the AAPL.  See Terry I. Cross, The Ties That Bind: Preemptive Rights
and Restraints on Alienation that Commonly Burden Oil and Gas Properties, 5
Tex. Wesleyan L. Rev. 193, 195-96
& nn.2-4 (1999) (discussing history of preferential right provision in AAPL
model form operating agreement and quoting the three different versions [1956,
1977, and 1989]); see also John R. Reeves, The Development of the
Model Form Operating Agreement: An Interpretive Accounting, 54 Okla. L. Rev. 211, 278-82 (2001). The
preferential right provision in the 1989 version does not vary appreciably from
that contained in the first model operating agreement adopted by the AAPL in
1956, which read as follows:

 

                Should any
party desire to sell all or any part of its interests under this contract, or
its rights and interests in the Unit Area, it shall promptly give written
notice to the other parties, with full information concerning its proposed
sale, which shall include the name and address of the prospective purchaser
(who must be ready, willing and able to purchase), the purchase price, and all
other terms of the offer.  The other parties shall then have an optional prior
right, for a period of ten (10) days after receipt of the notice, to purchase
on the same terms and conditions the interest which the other party proposes to
sell; and, if this optional right is exercised, the purchasing parties shall
share the purchased interest in the proportions that the interest of each bears
to the total interest of all purchasing parties.  However, there shall be no
preferential right to purchase in those cases where any party wishes to
mortgage its interests, or to dispose of its interests by merger,
reorganization, consolidation, or sale of all of its assets, or a sale or
transfer of its interests to a subsidiary or parent company, or subsidiary of a
parent company, or to any company in which any one party owns a majority of the
stock.

 

Cross, 5 Tex.
Wesleyan L. Rev. at 195 n.2.





[2]
              Navasota also filed a lis
pendens with respect to the Hilltop Prospect on October 31.

 





[3]
              Chesapeake’s motion was a
traditional summary judgment motion, as were those filed subsequently by the
other parties.





[4]
              By comparison, an appellate court may reverse and remand if
resolution of the pertinent issues rests in disputed facts or if the parties’
motions are premised on different grounds.  See Sarandos v. Blanton, 25
S.W.3d 811, 814 & n.5 (Tex. App.—Waco 2000, pet. denied).





[5]
              See Aden v. Estate of
Hathaway, 162 Colo. 311, 427 P.2d 333, 334 (1967); Myers v. Lovetinsky,
189 N.W.2d 571, 575-77 (Iowa 1971); Straley v. Osborne, 256 Md. 514, 278
A.2d 64, 69-70 (1971); Crow-Spieker #23 v. Robert L. Helms Constr. &
Dev. Co., 103 Nev. 1, 731 P.2d 348, 350 (1987) (per curiam); Johnnies
Pelham Rd. Serv., Inc. v. Thomas, 26 A.D.3d 414, 809 N.Y.S.2d 561, 563
(N.Y. App. Div. 2006); Ollie v. Rainbolt, 1983 OK 79, 669 P.2d 275, 279-81
(1983); Sawyer v. Firestone, 513 A.2d 36, 39-40 (R.I. 1986); Smith v.
Traxler, 228 S.C. 418, 90 S.E.2d 482, 488 (1955); see also In re New Era
Resorts, LLC, 238 B.R. 381, 386-87 (Bankr. E.D. Tenn. 1999) (applying Tennessee law); Manella v. Brown Co., 537 F. Supp. 1226, 1229 (D. Mass. 1982)
(applying Maine law).

 





[6]
              See Maron v. Howard, 258 Cal. App. 2d 473, 66 Cal. Rptr. 70, 79 (Cal.
Ct. App. 1968); Denco, Inc. v. Belk, 97 So. 2d 261, 265 (Fla. 1957); N.
Side Asphalt & Material Transp., Inc. v. Foreman, 520 N.E.2d 457, 460
(Ind. Ct. App. 1988); Unlimited Equip. Lines, Inc. v. Graphic Arts Ctr.,
Inc., 889 S.W.2d 926, 935 (Mo. Ct. App. 1994); Berry-Iverson Co. of
N.D., Inc. v. Johnson, 242 N.W.2d 126, 133-34 (N.D. 1976); Janas v.
Simmons, No. WD-86-60, 1987 WL 9903, at *2-3, app. at *10 (Ohio Ct. App.
1987) (not designated for publication); Landa v. Century 21 Simmons &
Co., 237 Va. 374, 377 S.E.2d 416, 421 (1989); Wilber Lime Prods., Inc.
v. Ahrndt, 268 Wis. 2d 650, 673 N.W.2d 339, 343 (Wis. Ct. App. 2003); see
also Pantry Pride Enters., Inc. v. Stop & Shop Cos., 806 F.2d 1227,
1229-31 (4th Cir. 1986) (applying Virginia law).

 

 





[7]
              Another body of cases exists
under the federal Petroleum Marketing Practices Act and similar state laws.  See
15 U.S.C.S. §§ 2801-2841 (LexisNexis 2005).  The PMPA provides for a statutory
right of first refusal for certain franchisees when a petroleum franchisor has
received a bona fide offer for the franchisor’s interest in the premises.  Id. § 2802(b)(3)(D)(iii)(II).  The decisions under the PMPA involving multi-asset
transactions likewise vary as to whether a franchisee is entitled to specific
performance.  See, e.g., Ellis v. Mobil Oil, 969 F.2d 784, 785-86 (9th
Cir. 1992) (PMPA right of first refusal not invoked where Mobil negotiated deal
exchanging eight Mobil stations for six Unocal stations); Arnold v. Amoco
Oil Co., 872 F. Supp. 1493, 1499 (W.D. Va. 1995) (PMPA right of first
refusal is invoked in multi-station transaction “[w]hen the valuation of
individual properties is readily apparent and there is no evidence of unfair
manipulation”); Forty-Niner Truck Plaza, Inc. v. Union Oil Co. of Cal.,
58 Cal. App. 4th 1261, 68 Cal. Rptr. 2d 532, 543 (Cal. Ct. App. 1997) (applying
Arnold rationale to California statute modeled after PMPA).  We do not
rely on these cases for our analysis because they involve the interpretion of
statutory rights of first refusal and invoke statutory definitions not at issue
here.





[8]
              Accord Panther Pride
Enters., 806 F.2d at 1229; Johnnies Pelham Rd. Serv., 809 N.Y.S.2d
at 563; L.E. Wallach, Inc. v. Toll, 381 Pa. 423, 113 A.2d 258, 260
(1955); Landa, 377 S.E.2d at 421; see also Straley, 278 A.2d at
70 n.8 (lessee cannot compel lessor to sell him larger tract); Guaclides,
170 A.2d at 493 (same).

 





[9]
              Valero Transmission Company
was a predecessor in interest to West Texas Transmission, L.P.  See W. Tex. Transmission, L.P. v. Enron Corp., 907 F.2d 1554, 1556 (5th Cir. 1990).

 





[10]
            Enron was a successor in
interest to NorTex, the entity with which Valero executed the agreement
containing the preferential right provision.  Id.

 





[11]
            This was actually the second
notification from Enron because the first attempted sale to Valero failed on
its own terms when FTC approval was not received by the date specified in the
parties’ purchase agreement.  Id. at 1557-58.





[12]
            The Restatement (Second) of
Property also addresses restraints on alienation but in the context of donative
transfers, not commercial transactions.  See Procter v. Foxmeyer Drug Co.,
884 S.W.2d 853, 858 (Tex. App.—Dallas 1994, no writ).

 





[13]
            Section 1.1 of the Restatement
(Third) of Property defines a “servitude” as follows:

 

                (1) A
servitude is a legal device that creates a right or an obligation that runs
with land or an interest in land.

 

(a) Running with land means
that the right or obligation passes automatically to successive owners or
occupiers of the land or the interest in land with which the right or
obligation runs.

 

(b) A right that runs with
land is called a “benefit” and the interest in land with which it runs may be
called the “benefited” or “dominant” estate.

 

(c) An obligation that runs
with land is called a “burden” and the interest in land with which it runs may
be called the “burdened” or “servient” estate.

 

Restatement (Third) of
Prop.: Servitudes § 1.1(1) (2000).

 





[14]
            Section 413, comment c provides:

 

                The
interference with alienation present in a requirement that a designated person
be afforded a reasonable opportunity to meet any offer received from a third
person by an owner desirous of selling is so slight that the major policies
furthered by freedom of alienation are not infringed to a degree which requires
invalidation. Under these circumstances, the owner has two potential buyers at
the same price and is assured of a reasonably prompt culmination of the sale.

 

Restatement of Prop. § 413 cmt. c (1944).

 





[15]
            See Cambridge Co. v. E. Slope
Inv. Corp., 700 P.2d 537, 541-43 (Colo. 1985); Hinson v. Roberts,
256 Ga. 396, 349 S.E.2d 454, 456 (1986); Meridian Bowling Lanes, Inc. v.
Meridian Athletic Ass’n, 105 Idaho 509, 670 P.2d 1294, 1296-97 (1983); Drayson
v. Wolff, 277 Ill. App. 3d 975, 661 N.E.2d 486, 491-93 (1996); Terrell
v. Messenger, 428 So. 2d 1241, 1244-45 (La. Ct. App. 1983); Bortolotti
v. Hayden, 449 Mass. 193, 866 N.E.2d 882, 890-91 (2007); Stenke v.
Masland Dev. Co., 152 Mich. App. 562, 394 N.W.2d 418, 421-22 (1986); Murphy
Exploration & Prod. Co. v. Sun Operating Ltd. P’ship, 747 So. 2d 260,
262-63 (Miss. 1999); Lorentzen v. Smith, 129 N.M. 278, 5 P.3d 1082,
1086-87 (N.M. Ct. App. 2000); Metro. Transp. Auth. v. Bruken Realty Corp.,
67 N.Y.2d 156, 492 N.E.2d 379, 385 (1986); Smith v. Mitchell, 301 N.C.
58, 269 S.E.2d 608, 613 (1980); Robroy Land Co. v. Prather, 95 Wash. 2d 66, 622 P.2d 367, 369-71 (1980); see also Iglehart v. Phillips, 383 So. 2d
610, 614 (Fla. 1980) (“option restraint is reasonable if the option price is at
market or appraised value, irrespective of the duration of the option”).

 





[16]
            The other elements for a claim
of unilateral mistake are: “(2) the mistake relates to a material feature of
the contract; (3) the mistake occurred despite ordinary care; and (4) the
parties can be placed in status quo, i.e., the rescission must not
prejudice the other party except for the loss of the bargain.”  Ledig v.
Duke Energy Corp., 193 S.W.3d 167, 175 (Tex. App.—Houston [1st Dist.] 2006,
no pet.); N. Nat. Gas Co. v. Chisos Joint Venture I, 142 S.W.3d 447, 456
(Tex. App.—El Paso 2004, no pet.).

 

 





[17]
            This was actually the second
appeal in Foster.  See Foster v. Bullard, 496 S.W.2d 724 (Tex. Civ. App.—Austin 1973, writ ref’d n.r.e.).





[18]
            Navasota’s third amended petition alleged claims for breach of
contract, suit to quiet title, trespass to try title, tortious interference
with contract, conversion, money had and received, and declaratory relief.  Navasota’s summary judgment motion, however, alleged an entitlement to judgment on only its
claims for breach of contract and for declaratory relief in the form of
specific performance.  Thus, Navasota’s summary judgment motion sought only a
partial summary judgment.  See CU Lloyd’s of Tex. v. Feldman, 977 S.W.2d
568, 569 (Tex. 1998) (per curiam); Bowman v. Lumberton Indep. Sch. Dist.,
801 S.W.2d 883, 889 (Tex. 1990).