

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-13-00027-CV

_____

WILLIAM R. AND SUSAN M. KNODERER, Appellants

V.

STATE FARM LLOYDS, PENNI PERKINS AND TOM ROBERTS, Appellees

On Appeal from the 354th District Court
Hunt County, Texas
Trial Court No. 74,037

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

# MEMORANDUM OPINION

In this case, both sides—William R. Knoderer and wife, Susan M. Knoderer, as plaintiffs (collectively, the Knoderers), and State Farm Lloyds, Penni Perkins, and Tom Roberts, as defendants (collectively, State Farm)—have gone to remarkable lengths in fighting an insurance dispute over a house flooded by a leak in its plumbing system. The record reveals voluminous discovery, the substantial use of experts by both sides, the apparently intentional destruction of evidence by William in direct violation of a trial court directive, the substantial disembowelment of the Knoderer house, and the remarkable discovery sanctions of the procedural "death penalty"[1] together with monetary sanctions assessed against the Knoderers of over one million dollars. This appeal is about those sanctions.

State Farm requested these death penalty sanctions based on its allegations that the Knoderers—after they allegedly pried a water valve fitting from the water pipe causing their house to flood February 20, 2008—first, fabricated six photographs in an attempt to discredit State Farm's analysis and, then, intentionally destroyed evidence concerning these six fabricated photographs just hours after being explicitly directed by the trial court to preserve it. The trial court granted State Farm's latest motion for sanctions, rendered judgment deciding the case in favor of State Farm, and ordered the Knoderers to pay State Farm $142,339.44 in expert fees, $33,474.57 in costs, and $1,000,000.00 in attorneys' fees.

---

[1]Rule 215.2(b)(5) of the Texas Rules of Civil Procedure authorizes a trial court, in certain extreme cases of discovery abuse, to strike pleadings, dismiss with prejudice, or render a default judgment. TEX. R. CIV. P. 215.2(b)(5). Such sanctions are commonly called the "death penalty."

On appeal, the Knoderers attack the sanctions. They claim that it was error to assess sanctions against Susan and that the "death penalty" sanctions were improper. State Farm disagrees and argues that the Knoderers failed to assign error challenging the monetary sanctions.

We reverse and remand this case to the trial court, because (1) "death penalty" sanctions are not sustainable on this record against either of the Knoderers, (2) the Knoderers fairly presented the claim that the monetary sanctions are excessive, (3) the monetary sanctions are excessive, and (4) without evidence that Susan committed any sanctionable conduct, sanctions were improperly assessed against her.

The ill will between the parties apparently originates from a prior lawsuit the Knoderers lost seeking compensation from State Farm for mold resulting from an earlier water leak. Before the current case arose, a water filter valve had burst and flooded the Knoderers' home. Mold had been discovered, but, after restoration was completed, State Farm refused to "pay to completely redo those repairs to access and address hidden mold." State Farm also had prevailed in the precursor lawsuit in its position that the Knoderers' policy did not cover mold.

After losing that first lawsuit, the Knoderers added specific mold coverage to their homeowner's policy. On January 30, 2008, State Farm, after determining the coverage should not have been issued, sent the Knoderers a letter advising that their mold coverage would cease effective March 6, 2008. On the evening of February 20, 2008, a blue PEX pipe supply line separated from a brass "SharkBite" fitting inside the wall of a utility closet, flooding the Knoderers' residence.

3

State Farm hired Dr. Antoine Rios, Ph.D., a mechanical engineer, to conduct an expert analysis of the fitting. Rios released his initial report on the pipe fitting March 13, 2008. This report concluded that it was "unlikely that pull out occurred due to water pressure alone." State Farm requested additional testing.

Meanwhile, State Farm sent the Knoderers a letter demanding access to the home[2] and representing, "In accordance with your contract, we will pay for water damages and necessary mold remediation resulting from the February 20, 2008[,] water loss." Two additional letters dated April 29, 2008, and May 7, 2008, can reasonably be interpreted to represent that demolition was necessary and that State Farm would pay for the restoration. After the Knoderers granted State Farm access to the house, the cabinets, countertops, fixtures, appliances, doors, trim, flooring, and bottom four feet of sheetrock were removed from the house.

A more detailed report was issued by Rios May 18, 2008. This report stated,

The failed fitting shows slight drag marks instead of grooves, as demonstrated in the pull out test samples. The witness marks of the failed fitting indicate that the tube was appropriately inserted. The witness marks are deeper than the drag marks. This is an indication that the teeth had to be partially released to allow the tube to be pulled out. Additionally, the drag marks are not symmetrical on the tube, which indicates that some teeth were released further than others.

In two later reports issued March 12, 2009, and July 1, 2010, Rios conducted additional testing, including various pressure tests, and concluded that the "tests clearly show that the collar partially retracted the teeth consistent with the use of a screwdriver, or similar tool, to press the collar of the actual fitting."

---

[2]The letter states that the Knoderers were denying access until State Farm committed to what it would pay for and the cost of those repairs.

4

The Knoderers filed this lawsuit claiming State Farm used deception to increase the Knoderers' damages by misrepresenting in their letters to the Knoderers that State Farm would pay for the demolition and restoration of the house. The Knoderers' cause of action was based on the Texas Insurance Code.[3] Section 541.060(a)(1) provides in pertinent part:

> (a)    It is an unfair method of competition or an unfair or deceptive act or practice in the business of insurance to engage in the following unfair settlement practices with respect to a claim by an insured or beneficiary:
>> (1)    Misrepresenting to a claimant a material fact or policy provision relating to coverage at issue . . . .

TEX. INS. CODE ANN. § 541.060(a)(1) (West 2009). Section 541.061 provides in pertinent part:

> It is an unfair method of competition or an unfair or deceptive act or practice in the business of insurance to misrepresent an insurance policy by:
>> (1)    making an untrue statement of material fact;
>>
>> . . . .
>>
>> (3)    making a statement in a manner that would mislead a reasonably prudent person to a false conclusion of a material fact. . . .

TEX. INS. CODE ANN. § 541.061 (West 2009). The Knoderers' latest petition alleges violations only of subsections (1) and (3).

The record contains evidence that State Farm suspected the claim might be denied when it sent the letter promising to pay for the restoration. Tom Roberts, the State Farm agent who sent the letter, states in his affidavit,

> After receiving, considering and analyzing the initial report from The Madison Group, opining that it was unlikely the loss occurred due to water pressure on the fitting alone, it was determined that State Farm needed outside legal assistance and advice in connection with its ongoing investigation.

---

[3]Although the Knoderers initially alleged other causes of action, including breach of contract, their last petition limits their cause of action to the Texas Insurance Code.

5

The Knoderers claim this admission establishes that the letter contains misrepresentations.

The Knoderers denied State Farm's claims of fraud. Although the Knoderers did not contest the evidence with competing scientific experts, the Knoderers have some compelling contrary evidence. The Knoderers were in Vermont for six days starting February 13. Kelly Gaudreau, Acting Director of the Greenville YMCA, states in his affidavit that he was a housesitter for the Knoderers for ten years and took care of the house on the weekend in question. Gaudreau states he did laundry Sunday, February 17, and did not notice any water leaks in the utility closet. Gaudreau left the house at 9:00 a.m. February 19. Scott Mooney[4] testified in his deposition that it was impossible to disconnect the pipe, re-sheetrock the wall, have the sheetrock dry, and then paint the wall "in that short amount of time." Randy Wineinger, owner of R.L. Wineinger Construction,[5] identified the sheetrock patch[6] as the same sheetrock patch he installed nine months before. Wineinger states in his affidavit:

> Those photos depict exactly the sheetrock repair I made before the leak involved in this matter occurring. The reason the texture and finish are different in my repair to that area is that when I was making the two sheetrock repairs to the utility closet, I was using texture from an aerosol spray can. I ran out of spray texture before I could finish the sheetrock repair in the exact area where the leak in this case occurred. The sheetrock patch over the area where the leak in this case occurred was exactly as I left it in the repair I made there some nine months before the leak involved in this matter occurred. I recognize my work, and that sheetrock patch that was removed after the leak in this matter is the exact patch which I installed before the leak involved in this matter. The texture and finish of my repair in that area are different simply because I ran out of the spray texture

---

[4]The record contains only excerpts from Mooney's deposition, and the parties have not represented what Mooney's qualifications are other than that he is a disinterested witness.

[5]Wineinger is also the Hunt County Tax Assessor.

[6]State Farm claimed this patch was evidence that the Knoderers had caused the leak.

6

before I could complete the texturing and finishing of the sheetrock repair in that area.

The affidavit of Ronny Hobbs, the plumber who repaired the leak and removed the fitting, casts even more doubt on State Farm's evidence. Hobbs states that the fitting had been placed in a box with other fittings. Hobbs further states, "I informed Mr. Tayler that we could not say if this was the pipe from Mr. Knoderer's house and that we had attempted to see why the fitting failed and had assembled and disassembled the piece he took many times." Hobbs also states that the State Farm agent also left with "a fitting from my stock" which Hobbs had used to "show and discuss with [the agent] how it worked."

In his deposition, William disclosed for the first time that he had six photographs proving the fitting examined by Rios was not the fitting that failed. William testified that, after the fitting had failed, but before he had given it to State Farm, he had marked the fitting with an engraving tool and photographed the fitting. The Knoderers moved to strike Rios' testimony. The Knoderers attached to the motion the contested six photographs of the marked fitting. The fitting examined by Rios was not marked in the same manner as the fitting in the photographs. The implication of the motion is that State Farm had fabricated evidence. After producing the digital photographs in print, in PDF format, in PDF format with printed metadata, and in JPEG format with metadata deleted, the Knoderers finally produced in October 2010 the digital photographs in native format.

State Farm filed a Second Motion for Sanctions alleging the six photographs, purporting to be evidence that State Farm had fabricated evidence, actually were fabricated evidence themselves. State Farm presented an affidavit of Dr. Gavin Manes, who examined the metadata

7

of the digital photographs. Manes believed the "date/time" metadata had been altered to make the photographs appear to have been taken the day after the leak because (a) the numbering of the files differs from the automatic format and there is no gap in the sequence of photographs with the automatic format numbering, (b) the copyright metadata filed was set to "WRK"—an option not available until an update which occurred after July 28, 2008, and (c) the shuttercounts values confirm a lack of a gap in the sequence of photographs with the automatic format numbering and, when compared with the shuttercounts on other photographs, establish the six photographs were taken sometime between December 12, 2008, and March 15, 2010.

The Knoderers did attach the affidavit of George Reis, a former police detective, which controverts Manes' opinion, to their response.[7] Reis, disagreed with Manes' conclusion that the photographs had been fabricated. Reis explained deviation from automatic numbering and the shuttercount conflict could be explained by corruption of the files.[8] Reis noted at least two of the photographs had the same shuttercount. Since the shuttercount should be unique for each photograph, Reis concluded the files must have been corrupted and then recovered. Reis further noted the copyright metadata may have been added after the photograph had been taken by either the camera or photo-processing software such as Adobe Photoshop. Noting that the background

---

[7]State Farm objected to Reis' affidavit for relying on information not disclosed and for lacking a proper verification. We have not been directed to where State Farm brought this contention to the attention of the trial court or where the trial court ruled on this objection. State Farm claimed it would supplement the record with the trial court's "order sustaining State Farm's objections to the declaration of George Reis," but the supplementation includes just the order denying the second motion for sanctions and states that the trial court considered all evidence.

[8]At a later hearing on the motion to compel production of the hard drives, William testified that the camera's memory card had gotten wet and that he had used a recovery program to recover the pictures.

8

of the photographs shows the Knoderers' kitchen countertop intact,[9] Ries concluded the photographs must have been taken before the kitchen was gutted in April 2008.

The trial court denied State Farm's Second Motion for Sanctions. In a letter explaining its rulings, the trial court explained that the motion required a finding as to whether fraud or fabrication of evidence occurred. Specifically, the court stated, "Although much of Defendant's evidence as to the allegedly fabricated pictures is compelling . . . the Court is not the fact-finder in this case, the jury is."

State Farm filed a third motion for death penalty sanctions asking for reconsideration of its previous arguments and a motion to compel William to produce his hard drives for forensic testing. At the hearing on this third motion, William testified the files had been deleted by "Active Eraser," a software program that deletes files by overwriting the file location, during a scheduled process.[10] On August 9, 2011, the trial court ordered the hard drives produced.[11] The trial court ordered digital imaging of the hard drive and also explicitly directed the Knoderers that any CDs, hard drives, or flash drives containing photographs were "not to be in any way altered or disposed of" and "[e]verything is to be preserved and not altered in any way." When asked by State Farm to "preserve [the hard drives] in the state that they're in as of today" and to

---

[9]The photocopies in the record are difficult to see clearly, but the background appears to just show a granite countertop without any other distinguishing features. The fitting had been placed on a countertop and then photographed.

[10]William claims he used Active Eraser to ensure compliance with medical privacy laws including HIPPA.

[11]The Texas Supreme Court has held discovery of electronic storage devices is "particularly intrusive and should be generally discouraged." *In re Weekley Homes, L.P.*, 295 S.W.3d 309, 317 (Tex. 2009). The requesting party must make a threshold showing (a) that "the responding party has somehow defaulted in its obligation to search its records and produce the requested data," (b) that the responding party's production has been inadequate, and (c) that a search of the hard drive could recover deleted relevant materials. *Id*. The parties do not assign any error concerning the trial court's implied finding that State Farm met this threshold.

9

"no longer run an automatic delete program to wipe information," William responded, "Yes, ma'am."

After examining the hard drives, State Farm filed a Fourth Motion for Sanctions. At the hearing, Manes testified that the files had been deleted and overwritten by two different "scrubbing" software programs that had been run on the hard drive—Active Eraser and SDelete. Manes found a deleted email purchase receipt for Active Eraser indicating it was purchased on the day after William promised the trial court to preserve the files. Manes testified the Active Eraser setting was "manual" meaning that it did not run pursuant to a schedule and that the program was last run August 20, 2011. Manes further testified that, based on his testing of the product, the run date would not change if an erase is started but cancelled. The run date would change only on completion of a successful erase. Manes also testified that the computer settings indicated a user would have to confirm an erasure by clicking "yes" before the program would run. Manes also testified that the computer's registry files had been altered by a program called Registry Mechanic on August 19, 2011. Manes testified that, if Active Eraser or SDelete had not been run, the photographs could have been recovered.

The trial court granted State Farm's last motion for sanctions and struck the Knoderers' pleadings. The trial court specifically noted that it considered the conduct of the Knoderers during the entire litigation. State Farm sought a million dollars in attorneys' fees and filed almost 300 pages of billing records purporting to support a total of $1,316,497.37 in attorneys' fees.[12] In addition to the death penalty sanctions, the trial court assessed monetary sanctions in

---

[12]This Court did not attempt to independently verify this total.

10

the amount of $142,339.44 in expert fees, $33,474.57 in costs, and $1,000,000.00 in attorneys' fees.

At oral argument held by this Court, the parties agreed that the trial court issued no findings of fact. In the absence of findings of fact, we imply that the trial court found all facts necessary to support its decision so long as they are also supported by the evidence. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002); *see Betts v. Reed*, 165 S.W.3d 862, 867 (Tex. App.—Texarkana 2005, no pet.). The validity of implied findings may still be challenged on appeal for want of legal and factual sufficiency when the appellate record includes the reporter's and clerk's records. *Marchand*, 83 S.W.3d at 795; *Betts*, 165 S.W.3d at 867.

We review a trial court's ruling on a motion for sanctions for an abuse of discretion. *Cire v. Cummings*, 134 S.W.3d 835, 838 (Tex. 2004). An abuse of discretion occurs when a ruling is arbitrary or unreasonable, such as when a ruling is issued "without reference to any guiding rules and principles." *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). This much the parties agree on. The parties do not agree concerning the rest of our standard of review.

State Farm argues we must defer to the trial court's fact-findings if there is any evidence supporting the trial court's decision. It is true that no abuse of discretion has occurred if the ruling is based on conflicting evidence, some of which supports the decision under applicable law. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009) (citing *In re Barber*, 982 S.W.2d 364, 366 (Tex. 1998)). On the other hand, if the ruling is "contrary to the only

11

permissible view of probative, properly-admitted evidence," an abuse of discretion has occurred. *Id*.

As correctly explained by one of the cases relied on by State Farm—*Wein v. Sherman*, No. 03-10-00499-CV, 2013 Tex. App. LEXIS 10666, at *20 (Tex. App.—Austin Aug. 23, 2013, no pet.) (mem. op) (citing *Unifund CCR Partners v. Villa*, 273 S.W.3d 385, 388 (Tex. App.—San Antonio 2008), *rev'd*, 299 S.W.3d 92 (Tex. 2009)—sufficiency of the evidence is a factor to consider when reviewing for an abuse of discretion. *See, e.g.*, *Saint v. Bledsoe*, 416 S.W.3d 98, 111 (Tex. App.—Texarkana 2013, no pet.); *In re Marriage of Moncey*, 404 S.W.3d 701, 707 (Tex. App.—Texarkana 2013, no pet.); *Brooks v. Brooks*, 257 S.W.3d 418, 425 (Tex. App.—Fort Worth 2008, pet. denied).

In addition, State Farm argues, without citing authority in support of the argument, that we are restricted to the evidence presented at the hearing and cannot consider the Knoderers' affidavit evidence. We are to review sanctions from the entire record, including the evidence, arguments of counsel, written discovery on file, and the circumstances surrounding the party's discovery abuse. *Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006); *Gunn v. Fuqua*, 397 S.W.3d 358, 366 (Tex. App.—Dallas 2013, pet. denied); *Daniel v. Kelly Oil Corp.*, 981 S.W.2d 230, 234 (Tex. App.—Houston [1st Dist.] 1998, pet. denied). We consider the full record.

*(1)    "Death Penalty" Sanctions Are Not Sustainable on this Record Against Either of the Knoderers*

The Knoderers claim error by the trial court in assessing death penalty sanctions. Additionally, their fourth issue, the validity of State Farm's defenses, is intertwined with the

death penalty sanctions.[13]  The Knoderers argue that the death penalty sanction is inappropriate because the fabrication of evidence and destruction of evidence "did not go to the heart of the case," whether the Knoderers committed fraud is a fact issue for the jury, and no evidence justifies a presumption that the Knoderers' claims lack merit.

Any discovery sanctions must be just under the circumstances. *In re Ford Motor Co.*, 988 S.W.2d 714, 718 (Tex. 1998).  Two factors are used when determining whether any sanction is just—a relationship factor and a proportionality factor.  *Id.*; *In re Supportkids, Inc.*, 124 S.W.3d 804, 807 (Tex. App.—Houston [1st Dist.] 2003, orig. proceeding).  First, we consider whether a direct relationship exists between the sanctionable conduct and the resulting sanctions. *Ford Motor Co.*, 988 S.W.2d at 718; *Supportkids, Inc.*, 124 S.W.3d at 807.  Second, we consider whether the sanction is excessive.  *Ford Motor Co.*, 988 S.W.2d at 718; *Supportkids, Inc.*, 124 S.W.3d at 807.  A sanction is excessive if it is more severe than is necessary to satisfy its legitimate purpose.  *TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991); *see Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 372 S.W.3d 177, 184 (Tex. 2012). The sanctioning court must consider whether less stringent sanctions are available and whether they would fully promote compliance.  *Powell*, 811 S.W.2d at 917.

The so-called "death penalty" sanctions, which effectively decide a case on the merits, are more extreme than other sanctions and are to be used in only a limited range of cases.  Our reading of the more stringent factors for review of "death penalty" sanctions suggests that they

---

[13]State Farm argues that the Knoderers' fourth issue seeks an advisory opinion.  As discussed below, State Farm, at least partially, places these defenses in dispute.  State Farm's argument that the fabricated evidence and destroyed evidence go to the heart of the lawsuit explicitly relies on two of these defenses.  We have addressed State Farm's defenses to the extent they are relevant to this appeal and not as an advisory opinion.

13

use the relationship and proportionality factors, but raise the bar in each case. In evaluating the relationship between the sanction and the conduct it addresses, "death penalty" sanctions can be appropriate where a party's conduct "justifies a presumption that its claims or defenses lack merit." *Cire*, 134 S.W.3d at 840. Then, evaluating proportionality, before a sanction that effectively disposes of a case on the merits is appropriate, lesser sanctions must at least be considered to remedy the problem. *Id.* at 840, 842. In all but the most egregious cases, the sanctioning court must actually test lesser sanctions before striking pleadings. *Id*. at 842. In all cases, the record must reflect that the trial court considered the availability of appropriate lesser sanctions and must contain an explanation of the appropriateness of the sanction imposed. *Id*. The trial court need not test the effectiveness of each available lesser sanction by actually imposing the lesser sanction on the party before issuing the death penalty sanction; rather, the trial court must analyze the available sanctions and offer a reasoned explanation as to the appropriateness of the sanction imposed. *Id*. at 840.

Although (a) we defer to the implied findings that the six fitting photographs were fabricated and that evidence concerning the fabrication was destroyed, we conclude that the death penalty sanctions in this case fail to survive either the relationship test or the proportionality test, because (b) the abuse does not justify the required implied finding that the Knoderers caused the February 20, 2008, water leak and (c) the record does not reflect the required consideration of appropriate sanctions lesser than the death penalty.

14

*(a)     We Defer to the Implied Findings that the Six Fitting Photographs Were Fabricated and that Evidence Concerning the Fabrication Was Destroyed*

State Farm contends we must defer to the implied finding that William fabricated the six photographs of the fitting.  We agree.

As discussed above, Manes testified that, based on his examination of the metadata of the digital photographs, that the photographs had been fabricated.  As also discussed above, Reis, after examining the same metadata, concluded the files must have been corrupted and then recovered.  Reis' affidavit, while it provides a reasonable alternative to fabrication, is not so persuasive that it is conclusive.  The evidence is sufficient to support an implied finding that William fabricated the photographs.  The resolution of this conflicting evidence is within the zone of reasonable disagreement.  William's destruction of the computer data related to the six photographs in question certainly allows a reasonable inference that he fabricated those photographs.  We defer to the trial court's implied finding that William fabricated the six photographs of the fitting.

*(b)     The Abuse Does Not Justify the Required Implied Finding that the Knoderers Caused the February 20, 2008, Water Leak*

State Farm argues that the discovery abuse justifies a conclusion that the Knoderers intentionally flooded their house.  If that position is incorrect, the death penalty sanctions cannot be authorized.  *Id.*  Because the destroyed evidence did not go to the heart of this case, but was, instead, impeachment evidence, such a conclusion does not follow from this discovery abuse.  This factor, alone, renders the death penalty sanction improper.

15

Although a trial court may make factual determinations in assessing sanctions, sanctions should not "be used to adjudicate the merits of a party's claims or defenses unless a party's hindrance of the discovery process justifies a presumption that its claims or defenses lack merit." *Powell*, 811 S.W.2d at 918; *see Retamco Operating, Inc.*, 372 S.W.3d at 184; *Lanfear v. Blackmon*, 827 S.W.2d 87, 91 (Tex. App.—Corpus Christi 1992, orig. proceeding) (judge erred in granting death penalty sanctions when it concluded witness was committing perjury).

The meaning of that rule, that is, an understanding of what "justifies" a presumption in this context, becomes clearer when one realizes that the rule originates from constitutional due process requirements. *See Hammond Packing Co. v. State of Arkansas*, 212 U.S. 322, 350–51 (1909); *see also Ins. Corp. of Ireland, Ltd. v. Compagnie*, 456 U.S. 694, 705 (1982). In *Hammond Packing*, the United States Supreme Court recognized that, under the exigencies of due process, a court's presumption that a claim lacks merit must be made based on the wrongful destruction or withholding of evidence that could have proven or disproven the claim. *Hammond Packing Co.*, 212 U.S. at 350–51. Here, the destroyed evidence could have supported or undercut only the argument that the six photographs were fabricated, not the ultimate issues in the lawsuit. Therefore, the destruction of the data related to the six photographs does not justify a conclusion that the Knoderers' claims lack merit.

Here, the destroyed evidence does not go to the heart of this case. At the heart of this case lie two ultimate questions: (1) whether the Knoderers intentionally caused a water leak in their house to trigger an insurance payment and (2) whether State Farm made misrepresentations about repairs in the aftermath of the water damage. The destroyed evidence concerned the

16

Knoderers' attempted impeachment of State Farm's expert. Unlike the audio tapes in *Cire*, the destroyed evidence concerned impeachment evidence,[14] not evidence that goes to the heart of the case.

In two of the cases relied on by State Farm, the fabricated evidence went to the heart of the case. *See Daniel v. Kelly Oil Corp.*, 981 S.W.2d 230, 234 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (fabricated tape of act of harassment in sexual harassment suit); *JNS Enter., Inc. v. Dixie Demolition, LLC*, 430 S.W.3d 444, 455 (Tex. App.—Austin 2013, pet. denied) ("[T]hese fabricated documents would have been the principal evidence that Leesboro and JNS needed to succeed in most of their claims against Dixie, AAR, and Velez."). The fabricated evidence in this case does not go to the heart of the case.

The remaining case relied on by State Farm to prove William's conduct goes to the heart of the case is *Response Time v. Sterling Commerce*, 95 S.W.3d 656, 660 (Tex. App.—Dallas 2002, no pet.). This case does not discuss whether the evidence went to the heart of the case. *Id.* In *Response Time*, the fabricated evidence concerned a counterclaim that was later abandoned. *Id.* However, the conduct in *Response Time* demonstrated a pattern of conduct intended to obstruct due process. *Id.* The sanctioned party had violated an injunction, had provided false interrogatory responses, had fabricated a letter, and had provided irreconcilable testimony. *Id.* The Dallas Court of Appeals held this demonstrated a pattern of conduct sufficient to create a presumption the claims lacked merit. *Id.* *Response Time* is distinguishable from this case

---

[14]In *Lanfear*, the court explicitly rejected that credibility goes to the heart of a case. *Lanfear*, 827 S.W.2d at 91. The court held that "[t]he statement of relator, whether perjurious or not, does not go to the heart of the controversy here" and was not grounds to grant death penalty sanctions. *Id.* Similarly, the fabricated and destroyed evidence in this case concerned impeachment of State Farm's expert.

because, as discussed above, this case does not demonstrate a pattern of discovery abuse and obstruction of due process.

State Farm asserts that the Knoderers engaged in a pattern of discovery violations that justifies a conclusion that their claims lack merit. State Farm points to four instances of conduct. According to State Farm, the Knoderers asserted undue influence on their appraiser, asked one expert to destroy evidence, destroyed their handwritten notes used in preparing witness statements, and failed to timely produce the six fabricated fitting photographs and information regarding them.

We find no evidence in this record that the first two instances of conduct are discovery violations. State Farm alleges the Knoderers exercised undue influence on their appraiser and drafted the appraisal themselves. The appraiser's affidavit states he was impartial. We have not been directed to any evidence the appraiser was not impartial, and the trial court did not make any factual determination on this issue. Second, while William sent emails to an expert suggesting that he "dump" emails, we find no evidence where material emails were destroyed. Without evidence that the expert actually destroyed emails, the record does not support a discovery violation. The claim falls short that these two instances of conduct were part of a pattern of discovery violations.

The third instance of conduct is best characterized as inappropriate behavior by an overzealous non-lawyer party than an intentional discovery violation. The Knoderers gathered handwritten statements from various witnesses and then destroyed the handwritten statements before disclosing them. Although the Knoderers had been through at least one previous

18

contentious litigation, the record does not demonstrate the level of knowledge of the rules governing discovery possessed by the Knoderers. Viewed in context, we do not view this instance as an intentional discovery violation.

The fourth instance could demonstrate an intentional discovery violation. William's production concerning the six fabricated photographs was not as forthcoming as it could have been. Despite State Farm's request to produce all photographs before William's deposition, these photographs had not been produced.[15] When Knoderer produced black and white photographs, State Farm objected and requested electronic copies. The Knoderers then produced a Blu-ray disc with thumbnails. When Knoderer produced the photographs in PDF format, State Farm objected and requested metadata. Knoderer produced a printout of the metadata. Eventually, Knoderer produced the photographs in jpeg format with the relevant metadata. State Farm argues this conduct was an attempt to prevent discovery that the photographs were fabricated. That may very well be, but the Knoderers' lack of cooperation regarding the six photographs is, in our opinion, cut from the same fabric as the destruction of the computer files related to the same photographs. That recalcitrance, even along with the destruction of the computer data regarding the photographs, does not justify a conclusion that the Knoderers' ultimate claims are meritless.[16]

---

[15] A number of audio recordings William had made of his conversations with State Farm had also not been produced. The trial court ordered these audio recordings be produced when it granted State Farm's first motion to compel.

[16] State Farm alternatively argues that the fabricated evidence and destroyed evidence go to the heart of this case based on two other legal theories. One of these theories is that the fabrication of evidence constitutes fraud and should be considered as a factor to bar recovery. *See Dugger v. Arredondo*, 408 S.W.3d 825, 830 (Tex. 2013). The other theory is that the fraud permits coverage to be denied under the policy apart from the Texas Insurance Code.

*(c)     The Record Does Not Reflect the Required Consideration of Appropriate Sanctions Lesser than the Death Penalty*

A discovery sanction should be only as severe as necessary to achieve its legitimate purpose. *Powell*, 811 S.W.2d at 917. State Farm argues sanctions are justified based on both the fabrication of evidence and the destruction of the fabricated evidence.

At one time, language used by the Texas Supreme Court suggested that a trial court must impose lesser sanctions before imposing death penalty sanctions. *See Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 849 (Tex. 1992) ("Even then, lesser sanctions must first be tested to determine whether they are adequate to secure compliance, deterrence, and punishment of the offender."). Subsequently, that court clarified that the trial court must either consider lesser sanctions on the record or test lesser sanctions. *Cire*, 134 S.W.3d at 840.

> [I]n all but the most exceptional cases, the trial court must actually test the lesser sanctions before striking the pleadings.
>
> . . . .
>
> [I]n cases of exceptional misconduct[,] . . . the trial court need not test the effectiveness of each available lesser sanction by actually imposing the lesser sanction on the party before issuing the death penalty; rather, the trial court must analyze the available sanctions and offer a reasoned explanation as to the appropriateness of the sanction imposed.

*Id.* The court specifically noted it had not overruled the language in *Chrysler* and emphasized that case-determinative sanctions may be imposed only in exceptional cases where they are clearly justified and it is "'fully apparent that no lesser sanctions would promote compliance with the rules.'" *Id.* at 840–41 (quoting *GTE Commc'ns Sys. Corp. v. Tanner*, 856 S.W.2d 725 (Tex.

---

*See* TEX. INS. CODE ANN. §§ 541.060(a)(1), 541.061. These are substantive arguments on the merits and do not make Knoderer's offending behavior go to the heart of the case for the purposes of this discussion.

20

1993)); *see Ross v. Nat'l Ctr. for the Empl. of the Disabled*, 197 S.W.3d 795, 798 (Tex. 2006) (death penalty sanctions not appropriate as initial step). Thus, a trial court either must impose lesser sanctions first or must clearly explain on the record why the case is an exceptional case where it is fully apparent that no lesser sanctions could promote compliance.

The trial court's September 20, 2012, letter finds that "[s]anctions previously imposed on Plaintiffs have failed to dissuade Plaintiff's egregious conduct." State Farm claims in its brief that the trial court had earlier assessed monetary sanctions against the Knoderers. But we are not directed to any place in the record demonstrating that monetary sanctions were assessed. The trial court granted some part of three discovery motions against the Knoderers. On April 27, 2011, the trial court ordered the production of approximately 100 digital photographs "numbered _DSC5000.jpg through _DSC5100.jpg" and ordered all future productions to be made in native or original format of the file in question. State Farm claims the trial court assessed $8,000.00 in sanctions on that occasion, but the order strikes the request for monetary sanctions with the handwritten explanation "will be determined at later time." State Farm conceded at oral argument that monetary sanctions had not been previously assessed.

Some confusion arises because many motions by State Farm seek sanctions as well as compelled discovery. There is a significant distinction between a motion to compel and a motion for sanctions. Our review of the record indicates the trial court granted motions to compel that were titled motions for sanctions but never actually imposed any sanctions until the death penalty sanctions at issue here.

21

Other than the incorrect conclusion in the September 20, 2012, prejudgment letter that lesser sanctions had been imposed, the trial court did not consider lesser sanctions on the record. Thus, the record does not contain any explanation as to why lesser sanctions—a spoliation instruction, monetary sanctions, contempt, or some combination of those three—would not have been sufficient. The record reveals no compliance with the Texas Supreme Court's mandate to "analyze the available sanctions and offer a reasoned explanation as to the appropriateness of the sanction imposed." *Cire*, 134 S.W.3d at 840. Error occurred in the absence of either testing lesser sanctions or explaining why this case is an extreme case where lesser sanctions would not be adequate.

We do not wish to minimize the egregious nature of William's conduct. The trial court clearly would have had discretion to find William in contempt or to assess lesser sanctions targeted to address any prejudice suffered by State Farm. Nor do we wish to chastise the trial court—frustration in cases such as these is not unusual. The fact remains, however, that this is not one of the extreme cases permitting death penalty sanctions.

*(2)     The Knoderers Fairly Presented the Claim that the Monetary Sanctions Are Excessive*

Although the Knoderers' brief challenges the trial court's entire sanctions award, the brief fails to explicitly and clearly assign error concerning the excessiveness of the million dollar sanction for attorneys' fees. State Farm argues that the Knoderers have not assigned the monetary sanction for our review. In their reply brief, the Knoderers disagree. In essence, the Knoderers claim that they have challenged the monetary sanctions by challenging the entire order assessing sanctions and by praying for reversal of the entire order.

22

The Texas Supreme Court has repeatedly cautioned against addressing unassigned error. *See, e.g.*, *Pat Baker v. Wilson*, 971 S.W.2d 447, 450 (Tex. 1998); *Estate of Pollack v. McMurrey*, 858 S.W.2d 388, 395 (Tex. 1993); *Allright, Inc. v. Pearson*, 735 S.W.2d 240 (Tex. 1987). "Except for fundamental error, appellate courts are not authorized to consider issues not properly raised by the parties." *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 577 (Tex. 2006) (citing *In re B.L.D.*, 113 S.W.3d 340, 350–52 (Tex. 2003)); *Bankhead v. Maddox*, 135 S.W.3d 162, 163–64 (Tex. App.—Tyler 2004, no pet.) ("[A]n appellate court has no discretion to fabricate an issue not raised in the appellant's brief."). To determine whether we should address the monetary sanctions on the merits, we must first resolve error preservation.

New issues cannot be raised in a reply brief. *See, e.g.*, *Martin v. Martin*, 363 S.W.3d 221, 237 (Tex. App.—Texarkana 2012, pet. dism'd by agr.); *Ledig v. Duke Energy Corp.*, 193 S.W.3d 167, 177 n.8 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Because the Knoderers made a general challenge in their appellate brief, this case falls between a new issue being raised in a reply brief and a clear assignment of error in an appellants' brief.

The Texas Supreme Court has discouraged a technical approach to assignment of error. The Texas Supreme Court has held that "disposing of appeals for harmless procedural defects is disfavored." *Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex. 2008) (per curiam) (citing *Verburgt v. Dorner*, 959 S.W.2d 615, 616 (Tex. 1997)). "Appellate briefs are to be construed reasonably, yet liberally, so that the right to appellate review is not lost by waiver." *Perry*, 272 S.W.3d at 587. We must treat the statement of an issue "'as covering every subsidiary question that is fairly included.'" *Weeks Marine, Inc. v. Garza*, 371 S.W.3d 157, 162 (Tex. 2012) (quoting TEX. R.

23

APP. P. 38.1(f)). Appellants can assign error "in the body of their appellate brief," even if it is not separately listed in the notice of appeal or presented as an issue in the brief. *Perry*, 272 S.W.3d at 586; *see Weeks Marine*, 371 S.W.3d at 162; *Holley v. Watts*, 629 S.W.2d 694, 696 (Tex. 1982) (Appellate courts "look not only at the wording of the points of error, but to the argument under each point to determine as best we can the intent of the party.").

That latitude, though, does not permit us to wholly rewrite the issue. *Christopher Boehringer & Enginuity Eng'g, Inc. v. Konkel*, 404 S.W.3d 18, 27 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (unassigned jury charge error is not a subsidiary question to a legal sufficiency challenge); *see* TEX. R. APP. P. 38.9. The question is whether the Knoderers' general challenge assigned the issue for our review even though it failed to provide the specific arguments in support of that issue.

We conclude that the Knoderers' general challenge to the sanction award did assign for our review the issue of the excessiveness of the monetary sanctions. As demonstrated by the following cases, an appellant is not required to advance a perfect legal argument and, when an appellant raises only a general challenge, specific arguments are generally considered subsidiary questions fairly included in the general challenge.

The Texas Supreme Court recognizes that arguing the incorrect law does not prevent the correct law from being assigned for appellate review. *See Williams v. Khalaf*, 802 S.W.2d 651, 658 (Tex. 1990) (petitioner, while arguing claim was not barred by limitations, failed to argue correct statute of limitations in court of appeals and did not argue correct statute of limitations until supplemental writ of error); *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989)

24

(when wrong standard of review argued, court of appeals erred in applying incorrect standard of review and should have instead analyzed legal sufficiency under correct standard of review).

A specific argument not advanced until a reply brief, however, can be "fairly encompassed within the issue framed." *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 119 n.7 (Tex. 2009). In that case, the issue framed for review was whether the court of appeals erred in concluding the evidence supporting attorneys' fees was legally insufficient. *Id.* The petitioner's brief challenged the legal sufficiency of the evidence, but did not specifically argue the evidence of fees paid to "two attorneys who were not members of the firm" provided sufficient evidence to support the award reversed by the court of appeals. *Id.* The Texas Supreme Court held the specific argument was fairly included and addressed it. *Id.* at 119. Similarly, where a petition for discretionary review argued factually and legally insufficient evidence to support "the implied finding by the trial court that Michiana committed a tort in Texas," but did not argue lack of minimum contacts, it was held that the minimum-contacts doctrine was a fairly included subsidiary question assigned for review. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 781 (Tex. 2005).

Although the better practice would have been to make an explicit challenge to the monetary sanctions in their brief, the Knoderers have assigned error for our review. The excessiveness of the monetary sanctions is a subsidiary question fairly included within that general challenge.

*(3)     The Monetary Sanctions Are Excessive*

The trial court awarded $142,339.44 in expert fees, $33,474.57 in costs, and a million dollars in attorneys' fees. While we acknowledge State Farm presented billing records totaling $1,316,497.37, a cursory review of these records establishes that these records include all the attorneys' fees incurred by State Farm in this litigation. As noted above, the discovery abuse does not justify an implied finding that the Knoderers flooded their own house February 20, 2008. Thus, the question is whether the discovery abuse justifies the award of attorneys' fees, expenses, and costs for the entire case.

The Texas Supreme Court has suggested sanction awards of attorneys' fees are limited to those fees "incurred because of the sanctionable conduct." *Low v. Henry*, 221 S.W.3d 609, 621 (Tex. 2007). Also, a monetary sanction "should be no more severe than necessary to satisfy its legitimate purposes." *PR Invs. & Specialty Retailers, Inc. v. State*, 251 S.W.3d 472, 480 (Tex. 2008). "A sanction imposed for discovery abuse should be no more severe than necessary to satisfy its legitimate purposes." *Powell*, 811 S.W.2d at 917.

The award in this case is for essentially the total of State Farm's attorneys' fees in the case—not the attorneys' fees incurred due to the sanctionable conduct. Only the attorneys' fees, expert fee, and costs related to the six fabricated photographs should be included in the sanctions. We find an abuse of discretion in the award of attorneys' fees, expert fees, and costs for the entire case, rather than those related only to the sanctionable conduct.

*(4)*    *Without Evidence that Susan Committed Any Sanctionable Conduct, Sanctions Were Improperly Assessed Against Her*

Susan argues that the trial court erred in assessing sanctions against her because she was not the true offender and because there is no evidence William was acting as her agent. After the trial court assessed sanctions against both William and Susan, the Knoderers argued there was no evidence Susan committed any discovery violations and asked the trial court to reconsider. The trial court issued a letter stating, "As Mr. Scott's letter correctly points out Plaintiff Susan has not been directly connected to any misconduct" but left the sanctions intact.

It is inappropriate to hold one party liable for another party's misconduct. *Bodnow Corp. v. Hondo*, 721 S.W.2d 839, 840 (Tex. 1986). In *Hondo*, it was held inappropriate to impose joint and several liability on an intervenor for the misconduct of other plaintiffs. *Id*. The court reasoned, "Making a party liable for discovery expenses that are caused by another party's misconduct does not further any of the purposes that discovery sanctions were intended to further." *Id*. The Texas Supreme Court has repeatedly reaffirmed this principle. Sanctions must be imposed against the "true offender." *Am. Flood Research*, 192 S.W.3d at 583. The direct relationship requirement "means that the sanction should be visited on the offender," and the trial court must attempt to determine against whom "the offensive conduct is attributable." *Powell*, 811 S.W.2d at 917. Because there is no evidence Susan committed any wrongdoing, Susan was not the true offender.

State Farm claims Susan should be held liable because she is William's wife. The common law once imposed liability on a husband for the torts of his wife. *State Farm Lloyds v.*

27

*Williams*, 791 S.W.2d 542, 548 (Tex. App.—Dallas 1990, writ denied). That common law rule, however, has been abolished. *Id.* The Texas Family Code provides,

> (a)     A person is personally liable for the acts of the person's spouse only if:
>
> (1)     the spouse acts as an agent for the person; or
>
> (2)     the spouse incurs a debt for necessaries as provided by Subchapter F, Chapter 2.
>
> (b)     Except as provided by this subchapter, community property is not subject to a liability that arises from an act of a spouse.
>
> (c)     A spouse does not act as an agent for the other spouse solely because of the marriage relationship.

TEX. FAM. CODE ANN. § 3.201 (West 2006). Thus, one spouse may not be held personally liable for the other spouse's acts in the absence of an agency relationship or some participation by the spouse. *Williams*, 791 S.W.2d at 547–48. Susan cannot be held personally liable for the actions of her husband.[17]

State Farm argues William acted as Susan's agent. It is well established that a marital relationship does not, by itself, make one spouse the agent of the other. *See Wilkinson v. Stevison*, 514 S.W.2d 895, 898 (Tex. 1974); *Parker v. Carnahan*, 772 S.W.2d 151, 157 (Tex. App.—Texarkana 1989, writ denied). Further, an agency relationship cannot be presumed. *IRA Res., Inc. v. Griego*, 221 S.W.3d 592, 597 (Tex. 2007). "An agent is one who consents to the control of another, the principal, where the principal manifests consent that the agent shall act for

---

[17]This does not mean that all of Susan's property is completely exempt from liability. Susan's joint management community property is subject to tortious liability even in the absence of evidence of an agency relationship. TEX. FAM. CODE ANN. § 3.202(d) (West Supp. 2013); *Lawrence v. Hardy*, 583 S.W.2d 795, 798–99 (Tex. Civ. App.—San Antonio 1978, writ ref'd n.r.e.).

28

the principal." *First Nat'l Acceptance Co. v. Bishop*, 187 S.W.3d 710, 714 (Tex. App.—Corpus

Christi 2006, no pet.). This Court has noted,

> An essential element of the principal-agent relationship is the alleged principal's right to control the actions of the alleged agent. . . . This right includes not only the right to assign tasks, but also the right to dictate the means and details of the process by which an agent will accomplish the task.

*Townsend v. Univ. Hosp.-Univ. of Colo.*, 83 S.W.3d 913, 921 (Tex. App.—Texarkana 2002, pet.

denied) (citations omitted).

State Farm has not directed us to where the record contains evidence establishing agency.

At oral argument, State Farm argued William's affidavit indicates he was making decisions for

both Susan and himself. An agency relationship may be implied from the conduct of the parties

or from the facts and circumstances surrounding the transaction in question. *See CNOOC Se.*

*Asia Ltd. v. Paladin Res. (Sunda) Ltd.*, 222 S.W.3d 889, 899 (Tex. App.—Dallas 2007, pet.

denied); *Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 550 (Tex. App.—

Houston [14th Dist.] 2003, no pet.). State Farm did not advance any argument based on

William's affidavits in its appellee's brief. State Farm has not directed us to which affidavits

demonstrate an agency relationship. Finally, we are not convinced these affidavits establish

William was acting as Susan's agent rather than merely announcing collective decisions. The

fact that William announced the couple's collective decisions is not sufficient to imply an agency

relationship.

State Farm alternatively argues that Susan had a duty to prevent William from destroying

evidence. A duty to preserve evidence arises only under specific circumstances. *See Wal-Mart*

*Stores, Inc. v. Johnson*, 106 S.W.3d 718, 723 (Tex. 2003). State Farm cites the majority opinion

29

in *Trevino v. Ortega*, 969 S.W.2d 950 (Tex. 1998), for the proposition that Susan had a duty to preserve the evidence. The majority opinion in *Trevino*, though, does not support such a conclusion. The duty at issue was a duty created by statute. *See* TEX. HEALTH & SAFETY CODE ANN. § 241.103 (West Supp. 2013); *Trevino*, 969 S.W.2d at 953. Later in its brief, State Farm cites from Justice Baker's concurrence, *Trevino*, 969 S.W.2d at 956 (Baker, J., concurring), and *Offshore Pipelines v. Schooley*, 984 S.W.2d 654, 666 (Tex. App.—Houston [1st Dist.] 1998, no pet.). Both Justice Baker's concurrence and *Offshore Pipelines* hold that (a) once a party has notice of a potential claim, that party has a duty to exercise reasonable care to preserve information relevant to that claim, and (b) a party who intentionally or negligently fails to preserve relevant information may be held accountable for the loss of such evidence. *Trevino*, 969 S.W.2d at 956; *Offshore Pipelines*, 984 S.W.2d at 666. Neither of these opinions concerns when one party has a duty to prevent destruction by another party. State Farm has not provided us with any Texas authority that a wife has a duty to prevent her husband from destroying evidence.[18]

Even if we assume Susan had such a duty, evidence that she breached that duty would still be necessary. At a minimum, State Farm would have been required to present evidence that Susan intentionally or negligently permitted William to use the Active Delete and SDelete programs. The record does not contain any evidence Susan, herself, breached any duty.

---

[18]State Farm relies on a Pennsylvania case, *Papadoplos v. Schmidt*, No. 1930 CV 2002, 2010 Pa. Dist. & Cnty. Dec. LEXIS 168 (PA Common Pleas Court 2010), which imposes sanctions against both a husband and wife for destroying a hard drive that had been ordered to be produced. State Farm has failed to brief whether Pennsylvania has abandoned the common law rule that spouses are liable for each other's torts. Further, we are not bound by Pennsylvania opinions. We do not find this case persuasive.

The sanctions, both death penalty and monetary sanctions, assessed against Susan must fall.

We reverse the judgment of the trial court. We render judgment deleting all sanctions against Susan and remand for further proceedings consistent with our opinion including, at the discretion of the trial court, an assessment of other lesser sanctions against William.

Josh R. Morriss, III
Chief Justice

Date Submitted:     April 2, 2014
Date Decided:       September 19, 2014

31